DAVIES, Plaintiff, vs. J. D. WILSON COMPANY, Defendant. [Two appeals.]

*September 9—October 8, 1957.*

444

446

For the plaintiff there was a brief by *Shea & Hoyt* of Milwaukee, and oral argument by *Hamilton T. Hoyt.*

For the defendant there was a brief by *Zillmer & Redford* of Milwaukee, and oral argument by *John M. Redford.*

STEINLE, J. Specifically we are called upon to determine (a) whether the trial court erred in directing the verdict with respect to additional commissions earned by plaintiff on the Globe furnace job, the jury having determined that the plaintiff was entitled to the same in amount of $1,139.25, and the court holding that the plaintiff had waived his right thereto as a matter of law; (b) whether sec. 270.28, Stats., controls, neither party having requested submission to the jury of the question of waiver as a fact; (c) whether the statute of limitations, sec. 330.14 (Stats. 1951), barred the plaintiff from recovering commissions on two Globe invoices rendered before January 6, 1952; (d) whether there is sufficient evidence to support the jury's verdict that plaintiff is entitled to a 10 per cent commission of gross receipts on the Bucyrus-Erie boiler-setting job; (e) whether the plaintiff waived his right to receive a straight 10 per cent commission on the Bucyrus-Erie job; (f) whether the trial court erred in not having granted judgment in favor of the defendant on its cause of action as asserted in the counterclaim relating to damages resulting by reason of plaintiff's possession of certain of the defendant's documents and records; (g) whether the jury's verdict is to be set aside as being impossible, contradictory, and perverse.

In determining whether the trial court erred in directing a verdict, this court must take that view of the evidence which is most favorable to the party against whom the verdict was directed. *Mueller v. O'Leary* (1935), 216 Wis. 585, 587, 257 N. W. 161.

From evidence not disputed it appears that the defendant J. D. Wilson Company is a corporation whose business consists of acting as a manufacturer's representative and selling largely refractories or heat-resistant firebrick and plastics used in the lining of boilers and heat-treat and foundry furnaces. Besides others it represented the manufacturing firms of Babcock & Wilcox Company of New York and Laclede-

Christy Company of St. Louis. The defendant company also dealt in a line of industrial valves, pumps, and magnets. Altogether it engaged in the sale of about 90 products.

Robert S. Crichton was president and treasurer of the defendant company. His wife was the vice-president during the time in question. Crichton and his wife owned two thirds of the shares of stock of the company. Crichton was employed as a salesman for the company. Others who were stockholders and salesmen of the company were Messrs. Pfister, Webers, Knox, and McCotter. In April, 1948, the plaintiff, John J. Davies, was hired by Crichton as a salesman for the company at a salary of $300 per month. Davies did not become a stockholder of the company. In October, 1949, Crichton, on behalf of the company, changed Davies' compensation arrangement from that of salary to a commission basis. The commission employment agreement was oral and at the trial of this action some of its terms were in dispute.

Credible evidence of record favorable to the plaintiff Davies with respect to his claims for commissions, is as follows: While Davies was still on a salary basis, there was no limitation as to accounts in the Milwaukee territory that he was entitled to solicit. When Crichton changed Davies' arrangement to a commission basis, he defined Davies' territory and told Davies that both Globe and Bucyrus-Erie would be Davies' accounts, and that there would be no limitation as to what he could sell at either of said plants. Certain other of the plants in the Milwaukee territory were served by Webers or Crichton. The defendant's bookkeeper had knowledge of the accounts that were assigned to particular salesmen. Before leaving the defendant's employ in 1952, said bookkeeper made a book record which contained alphabetically a list of the plants in the territory and the initials of the defendant's salesmen who served the same. Davies' initials appeared in said book in connection with the Globe and Bucyrus-Erie accounts. The initials of no other salesmen

appeared in connection with the Bucyrus-Erie account, and said account as listed did not indicate two or more departments.

Crichton told Davies that the amount of his commission would depend upon the product sold unless there was a contract with the customer for not only the materials but the installation of the materials by the defendant as well, carrying one lump-sum contract price. Such material and installation agreement was called a turnkey contract, and the commission to Davies was to be 10 per cent of the entire contract price. When material alone was sold, Davies would be entitled to commission from 10 per cent to 16 per cent unless the same was shipped in carload lots, when the commission would be five per cent. With regard to a turnkey contract, the commission was to be 10 per cent notwithstanding that some of the materials were sold in carload lots. When the contract provided for the sale of material and the furnishing to the customer of labor at an hourly rate, the arrangement was not considered a turnkey contract but a time-and-material contract, and commissions would be paid only on the basis of the materials sold, but not on the price of the labor.

It was agreed that as to Davies' accounts he would receive full commission regardless of whether he had done any work on the order. The only time that a commission would be split between two salesmen was when an order was sold in one salesman's territory and was used in a plant in another salesman's territory. In the event that a salesman assisted another with reference to an account, he would not be entitled to a portion of the commission notwithstanding that his assistance was requested by the salesman to whom the account had been allocated. There was no agreement that Davies' commissions were in any way to be limited or affected by the amount of profit of the defendant on the job. In the event that Davies made a sale and the defendant

realized no profit, he would still be entitled to a full commission on the basis of the contract price.

Davies commenced selling items to Globe in the early part of 1949. Shortly after Davies' first contact with Globe, Crichton told him that Globe was expecting to rebuild its reheat and rotary furnaces. Crichton urged Davies to endeavor to procure that business for the defendant. In 1951 Davies obtained an order from Globe for firebrick for the east rotary furnace which was to be completely rebuilt. Globe actually installed two furnaces, one designated as the east rotary furnace, and the other the reheat furnace, both of which functioned as one unit.

Babcock & Wilcox Company had built some furnaces in New York which the Globe chief engineer wished to copy. Globe engaged the same engineers to design its new east rotary and reheat furnace unit. Since Babcock & Wilcox Company materials were specified in the New York furnaces, the specifications for the Globe furnace also called for Babcock & Wilcox Company materials. A Milwaukee territory representative of Babcock & Wilcox Company, Robert Onan, was entitled to sell the materials directly to Globe and by-pass the defendant company. Onan and Davies together had called on Globe for several years previously. Onan decided to place the order through the defendant and permit it to make a profit on the transaction. Crichton did not influence Onan in his decision to give the business to the defendant.

Globe ordered the materials from the defendant. Most of the quotations for the same were made by Babcock & Wilcox Company, and furnished to the defendant. The materials for both furnaces were ordered at the same time in 1951, but on separate order numbers. The defendant furnished some, but not all, of the labor for the installation of these materials. The labor was not ordered until October, 1951, after a priority had been obtained by Globe from the federal government for the shipment of the materials. (This took place in

the Korean War period.) The first materials for both furnaces were shipped to Globe in November, 1951, and were billed by the defendant at the same time. The bulk of the materials for the east rotary furnace was shipped and billed on January 10, 1952. The last materials were shipped in August, 1952. The final payment on this furnace unit rebuilding job was made by Globe to the defendant in September, 1952.

Because the Globe job was an order for materials and a lump-sum order for labor to install all of the materials, Davies considered it to be a turnkey contract for which he was entitled to a commission of 10 per cent. He believed that it could not be classified as a time-and-material job for the reason that the price for labor had been quoted prior to the performance of the installation.

Davies received his first commission on the Globe job in December, 1951. He was shocked to discover that with respect to the two billings to Globe, he received no commission on the smaller one for the east rotary furnace, and received only a two and one-half per cent commission on the larger one involving the reheat furnace. Davies immediately went to see Crichton and inquired as to why the commission was "so much lower than what it would have been normally." Crichton became flustered and gave no reason at all. He did not say that he was taking a part of the commission for himself, nor did he tell Davies that he had not put in enough time on the job to warrant payment of full commissions. Actually Crichton had taken five per cent on the smaller invoice for himself, and had also taken for himself a commission of two and one-half per cent on the larger invoice. Davies did not ascertain that Crichton had taken any of the commission for himself on the Globe jobs until after this action was commenced.

Davies did not accept or agree to Crichton's decision of the payment of the Globe commissions. He had planned on

marrying within two months and was counting on the payment of said commissions. He did not wish to leave the defendant's employ at the time because there were substantial additional commissions due him on the balance of the Globe job which had not yet been billed. He was hopeful that he might persuade Crichton to pay the balance due to him on these first two invoices. He spoke to Crichton about the matter on subsequent occasions, but did not obtain an explanation satisfactory to him. In January, 1952, when he received a three per cent commission on a billing of $35,993, he again questioned Crichton, but was unable to get a satisfactory explanation. At other times, prior to and after January, 1952, he protested the amounts paid to him on the Globe job. Crichton's answer was that the defendant would not pay more. Davies made up his mind to eventually sue for the unpaid commissions when he was in a financial position to leave the defendant's employ. He never told Crichton of such intention. He quit the defendant's employ on September 2, 1953, and immediately made claim for the unpaid Globe commissions. Previous to leaving he had continued to call at the Globe plant and render service in connection with that job. In April, 1952, he persuaded Globe to substitute a material of the defendant company for that of a competitor which had been originally specified for a portion of the east rotary hearth. At the same time he obtained the contract for the installation of said material and considered that it was a turnkey contract. Davies testified that the reason the defendant could pay a 10 per cent commission when it installed carload shipments of firebrick on which it received only a 10 per cent discount was that it marked up its labor 32 per cent.

The total billings by the company to Globe on the furnace job was $76,217. The total commissions paid to Davies on that job were $2,671.63 which amounted to three and one-third per cent of the billings. Crichton took $507 as commis-

sions. Davies was paid commissions on all labor furnished. (Crichton claimed that the commissions paid on labor furnished was in error.)

Davies started to call on Bucyrus-Erie in 1948 or 1949. He sold Bucyrus-Erie some Laclede-Christy cement and received between 10 per cent and 12 per cent commission on these sales. In December, 1949, he sold firebrick to Bucyrus-Erie and received a 10 per cent commission on the sale. He made many calls on Bucyrus-Erie. Except for one pump that Webers sold to Bucyrus-Erie between 1948 and 1953 when Davies was calling upon that firm, no other salesmen of the defendant sold products there. (Bucyrus-Erie had been Webers' account before Davies became identified with the company. Webers made no claim for commissions with respect to the Bucyrus-Erie boiler installations in dispute.)

The defendant had a contract with Laclede-Christy Company, whereby Bucyrus-Erie was excluded from carload sales of Laclede-Christy brick but not from carload shipments of specialities (plastics) or less-than-carload shipments of brick. Crichton had told Davies that if the defendant could develop more business at Bucyrus-Erie it might obtain a more-favorable contract from Laclede-Christy Company, eliminating the exclusion. Laclede-Christy did not install its materials. At times Laclede-Christy waived its exclusions. It indicated its willingness to waive the exclusion in the event that the defendant obtained the boiler-setting job at Bucyrus-Erie. The defendant obtained a turnkey contract for such job in 1953. About a year before the Bucyrus-Erie boiler-setting contract was obtained by the defendant, Davies had been apprised that said concern was contemplating a boiler setting. He learned about it from John Smart in Bucyrus-Erie's purchasing department. Davies had been calling on Smart for some time to sell materials in the heat-treat and foundry portion of the plant. He informed Smart as to how well the

defendant company's materials had held up in other boiler-setting installations, and endeavored to persuade him to give the defendant company consideration when the time came to bid on the boiler job. No one in the defendant company at any time told Davies not to sell materials for the powerhouse at Bucyrus-Erie.

In the early part of 1953 Bucyrus-Erie sent blueprints and specifications of their contemplated boiler-setting job to various qualified bidders, including the defendant company. At the request of the defendant, the Laclede-Christy Company made calculation of the materials required. The defendant estimated the labor. A proposed turnkey contract was submitted by the defendant to Bucyrus-Erie. The defendant obtained the contract. Subsequently Crichton became very active in the matter of the job at Bucyrus-Erie. He spent considerable time conferring with consulting engineers about it. Davies asked Crichton whether he would receive the normal 10 per cent commission on the job. Crichton told Davies that the defendant would not pay a commission on the job to him or to anyone else for the reason that Bucyrus-Erie was a house account. The first materials were shipped to Bucyrus-Erie in July, 1953. The salesman's copies of invoices of the various items were placed on Davies' desk the day after the shipment was made. His initials were on such invoice copies. No other of the salesmen were entitled to these slips. In the following month and at a time when Crichton was absent, Davies' commissions for the month of July were calculated by the defendant's clerk, Doris Neumeyer, who determined that Davies was entitled to a 10 per cent commission on the Bucyrus-Erie boiler-setting job which amounted to $1,057.40. The list of plants and salesmen which had been furnished to her by the defendant indicated that Bucyrus-Erie was Davies' account and that this was a turnkey-contract job. The clerk presented the list and the

invoices to the company's bookkeeper, Victor Harter, who was authorized to sign and issue commission checks in Crichton's absence. Webers was also authorized to sign commission checks in Crichton's absence. A check for $1,057.40 payable to Davies was signed by them and given to Davies, who accepted it for the reason that Bucyrus-Erie was his account. He assumed that Crichton had changed his opinion that it was a house account. Several days later Crichton learned that Davies had been paid a 10 per cent commission on the partial shipment on the Bucyrus-Erie boiler-setting job. He demanded that Davies repay the entire amount of the commission to the defendant company. When Davies refused to refund said amount, Crichton indicated that he would withhold commissions due to Davies until the amount had been made up. Davies immediately resigned his position and shortly thereafter made claim against the defendant company for the balance of the Globe commissions, the balance of the Bucyrus-Erie boiler-setting commission, and other commissions to which he was entitled.

The evidence presented on behalf of the defendant controverted in many respects that which was offered by the plaintiff. In regard to the issues involved in this appeal, it is deemed necessary to indicate only such of the defendant's evidence as disputes the material facts contended for by the plaintiff. However, before proceeding with such discussion, it is to be noted that certain of the facts were stipulated by the parties as being true and correct. The stipulated facts are as follows:

"(1) In April, 1948, defendant hired plaintiff on a salary as a salesman, and in October, 1949, plaintiff and defendant entered into an oral contract whereby it was agreed that in lieu of salary plaintiff was to be paid commissions for sales made in his territory.

"(2) The east rotary and reheat furnaces at Globe Steel Tubes Company (hereinafter called 'Globe') were part of

plaintiff's territory. Plaintiff and Robert S. Crichton, president of defendant, were both instrumental in selling that company the materials and installation thereof for rebuilding these furnaces in the years 1951 and 1952.

"(3) The schedule attached hereto and made a part hereof marked 'Exhibit A,' contains a true and correct tabulation of all the invoices, the payments to defendant by Globe, and the payment of commissions to plaintiff by defendant, relative to said east rotary and reheat furnaces, together with certain calculations based thereon. [Totals indicate $76,217.43 paid by Globe to defendant, and $2,671.63 paid as commission by defendant to Davies.]

"(4) With regard to said east rotary furnace, the principal order for materials was placed by Globe with defendant on July 17, 1951, as Order No. 78317; an order for labor to install said materials was placed by Globe with defendant on October 5, 1951, as Order No. 81843; the first materials were shipped to Globe by defendant on or about November 26, 1951; the bulk of the materials was shipped on or about January 10, 1952; the last of the materials under said Order No. 78317 was shipped on or about May 16, 1952; an additional order for materials, together with the labor to install same, was placed by Globe with defendant on May 20, 1952, as Order No. 87295; the last materials on the east rotary job were shipped on or about August 15, 1952; and the final payment to defendant by Globe on the east rotary job was made September 24, 1952.

"(5) With regard to said reheat furnace, the order for materials (Order No. 80036) was placed by Globe with defendant on July 17, 1951, on the same date as the principal order for the east rotary materials; the first materials were shipped to Globe by defendant on or about November 14, 1951; additional materials were shipped on or about January 25, 1952; and the last materials were shipped on or about May 10, 1952; and the final payment to defendant by Globe on the reheat job was made June 5, 1952.

"(6) The boiler-setting job at Bucyrus-Erie Company (herein called 'B-E'), which was sold and installed by defendant in 1953, was a turnkey contract between defendant and B-E, which means that any commission thereon is based on a lump-sum contract price for the entire job.

"(7) The total amount paid by B-E to defendant for the installation of said boiler setting was the sum of $30,275 and said amount was paid to defendant as follows: 8/21/53, $8,987.90; 10/26/53, $5,100; 11/15/53, $4,675; 12/15/53, $3,311.10; 1/13/54, $7,500; 5/21/54, $574; 5/25/54, $127; Total, $30,275.

"(8) On August 18, 1953, defendant paid plaintiff the sum of $1,057.40 as a commission on that part of said boiler setting which had been invoiced to B-E July 31, 1953, at $10,574.

"(9) Aside from the Globe and B-E accounts and any claims of setoff, defendant, as of September 29, 1953, owed plaintiff the sum of $727.54 for commissions due for the months of August and September, 1953, no part of which sum has been paid plaintiff."

The defendant's evidence contradicting in the main that offered by the plaintiff, was to the following effect: When Davies was placed on a commission basis, it was agreed that he was to service the foundry trade which included foundries, forge jobs, and heat-treat departments, and that Webers and Crichton would retain the power-plant accounts which they had previously handled. In the event that a concern allocated to the plaintiff had both a foundry and power plant, Davies was permitted to deal with such account only as to foundry items.

Davies was told that his commissions would be the same as those of the other of the defendant's salesmen, which arrangement consisted of payment of 50 per cent of the defendant's net profit on material sales; 50 per cent of the defendant's net profit on material sales up to 10 per cent on the contract price of "turnkey contracts;" no commissions on "labor-only contracts;" commissions on materials only on "time-and-material contract." On the bulk of the materials which the defendant warehoused, it paid commissions to the salesmen of 10 per cent to 16 per cent of the sale price. The percentage of commissions closely approximated 50 per cent of the defendant's net profit. On most material shipped di-

rectly by the defendant's suppliers, the defendant's gross discount was 10 per cent. The basis of materials shipped direct by the supplier was fixed by the supplier. The defendant's net profit on material shipped direct was about five per cent. Such net profit was divided equally between the defendant and the salesmen. In bidding on average-sized turnkey contracts, the defendant endeavored to mark up materials and labor so that a 10 per cent commission would be paid to the salesmen. This was not possible on large contracts because such bids would not be competitive. Under defendant's contract with Laclede-Christy, Bucyrus-Erie and other concerns were expressly excluded accounts, being served by a direct representative of Laclede-Christy. The plaintiff was advised of this by Laclede-Christy district manager and was told to stay out of Bucyrus-Erie.

Both plaintiff and Crichton were instrumental in obtaining the Globe orders. The first materials were shipped and invoiced in November, 1951, and the sum of $17,712.07 was paid by Globe on December 5, 1951. Later in that month a commission in the sum of $463.85, representing 2.6 per cent of the payment by Globe, was delivered to the plaintiff. Plaintiff promptly took up the matter with Crichton claiming that he was entitled to a commission of 10 per cent. Crichton told the plaintiff that this was not a turnkey contract and that it would not pay a commission of 10 per cent even though it had been such contract, and that the company's gross profit was only 10 per cent. Crichton also told the plaintiff that the defendant was not satisfied with the plaintiff's sales performance on the job, and that he had been paid the commission to which he was entitled. The plaintiff never indicated to the defendant that he was thinking of a suit then or that he might sue later. He never thereafter questioned the commission nor gave any inkling that he was not accepting Crichton's decision. Between February and December, 1952, the plaintiff received 10 additional payments

of commissions on Globe orders ranging from three to 16.1 per cent of the billings. He never questioned those payments. He accepted bonus checks from the defendant in December of 1951 and December of 1952.

In 1953 the defendant bid on a boiler setting at the powerhouse of Bucyrus-Erie. All of the negotiations leading up to this order were handled by Crichton with the consulting engineer employed by Bucyrus-Erie and by the plant engineer. Crichton obtained permission from Laclede-Christy to bid on this job, and the defendant was given the normal discount on the Laclede-Christy products which went into the job. The purchasing agent at Bucyrus-Erie testified that he had no negotiations with the plaintiff concerning the installation of the boiler setting. The plant engineer testified that he had never met the plaintiff nor had he consulted with him by telephone. The consulting engineer in charge testified that he had no discussions or negotiations relative to the boiler setting with the plaintiff, and that his negotiations in respect thereto were all with Crichton.

Some months before the boiler setting at Bucyrus-Erie was completed, the plaintiff inquired from Crichton whether he was going to receive a commission. Crichton told him that he would not and that the powerhouse at Bucyrus-Erie was not his account. Plaintiff made no protest. In July, 1953, the defendant sent a partial billing to Bucyrus-Erie on the boiler-setting contract. Thereafter, while Crichton was away from Milwaukee, a commission check was issued to the plaintiff for $1,057.40, being 10 per cent of the partial billing to Bucyrus-Erie. Crichton, after his return to the city, told plaintiff that the payment was made by mistake, and requested the plaintiff to return the amount. The plaintiff refused, and shortly thereafter he left the employ of the company.

With respect to its claim for damages arising from the plaintiff's withholding of defendant's documents and

records, the defendant's evidence was substantially as follows: After Davies left the defendant's employ in September, 1953, the defendant at various times demanded that he return its property. In October, 1953, by letter Davies made claims for commissions on the Globe and Bucyrus-Erie accounts. Inclosed in said letter was a list of invoices on Globe transactions indicating amounts and dates of commissions paid and due. The defendant referred the plaintiff's claim to its attorney, but was unable to supply the attorney with requested copies of invoices, purchase orders, correspondence, and other data relating to the Globe job, for the reason that such records could not be found in the proper place in the defendant's files. Shortly before an adverse examination of Crichton in August, 1954, Davies delivered the account-receivable card to the defendant. Had such card been in defendant's possession when Davies made his claim, it would not have been necessary for the defendant to spend time and money paging through a voluminous numerical control file to obtain information necessary in connection with Davies' claim. The demand for damages included the following: $400 legal fees resulting from the absence in the defendant's files of the records retained by Davies; $40 to $50 per day for four or five days spent by Crichton in search of the missing records, and in his endeavor to reconstruct the necessary information from other sources; three-weeks time spent by defendant's bookkeeper (his salary being $80 per week) in providing the necessary information from the numerical control file, which effort would not have been necessary had defendant's records been intact; an additional three weeks of time of the bookkeeper and others required to place the purchase orders, invoices, and correspondence in the proper files.

The plaintiff's evidence with respect to this issue was to the following effect: About a year before Davies left the defendant's employ, Crichton had given him a folder con-

taining records pertaining to the Globe job, and had requested Davies to make calculations of an overshipment of chrome ore on that job. Davies had taken the folder to his home for the purpose of doing the work as requested. He later placed it in a filing cabinet at home and completely forgot about its presence there. When clearing out his desk at the defendant's office at the time when he was leaving, he arranged to take some documents with him. Crichton was shown the material which Davies intended to take, removed some, and told Davies that he could take the balance. On September 30, 1953, Crichton wrote a letter to Davies demanding return of all company documents. Davies shortly thereafter delivered all of the company's documents to Crichton excepting the Globe folder which he did not remember having in his possession. After making demand upon the defendant by letter dated September 22, 1953, for Globe and Bucyrus-Erie commissions, the plaintiff personally went to the Globe office, and with the co-operation of office help there made copies of invoices, purchase orders, and payments relating to the furnace job. When the plaintiff was cleaning out his filing cabinet at home shortly before the adverse examination of Crichton on August 6, 1954, he discovered the Globe folder, and he immediately delivered it to his attorney. Some photostatic copies of the material in the folder were made for Davies' use. The entire folder was delivered to Crichton at the adverse examination. Invoices amounting to $42,000 of the $76,000 paid by Globe were never in the folder which Davies had unwittingly retained. The trial of the action was commenced on September 21, 1956.

While there is conflict in the evidence with respect to the issue as to whether the plaintiff was entitled to additional commissions for the Globe jobs, it is clear from a consideration of the evidence favorable to the plaintiff that the same is credible and sufficient to sustain the jury's find-

ings in relation to that issue. With respect to the issue as to the amount due for such additional commissions, it appears that the sum as found by the jury together with the total amounts previously paid on that job, approximated five per cent of the total amount paid by Globe to the defendant on the contracts. It is manifest that the jury rejected Davies' position that the Globe jobs in question were under a turnkey-contract arrangement. The jury may have decided on the basis of evidence which it deemed credible, that Davies was entitled to commission on materials only and not on labor or that Crichton was entitled to participate in the commissions. The evidence of record would support findings that commissions ranging from three per cent to 10 per cent were due to Davies. The jury was not obliged to accept the defendant's evidence that commissions were to be apportioned in accordance with defendant's profits. Since there is credible evidence to support the verdict with reference to the amount found to be due, the finding in such regard may not be disturbed. The rule asserted in *Trautmann v. Charles Schefft & Sons Co.* (1930), 201 Wis. 113, 115, 228 N. W. 741, is controlling with respect to the above issues relating to the Globe jobs. It was there said:

"The rule is well established that if the evidence is conflicting, or if the inferences to be drawn from the credible evidence are doubtful and uncertain, and there is any credible evidence which under any reasonable view will support or admit of an inference either for or against the claim or contention of any party, then the rule that the proper inference to be drawn therefrom is a question for the jury should be firmly adhered to, and the court should not assume to answer such question either upon a motion for nonsuit or direction of verdict, or by substituting another answer after the verdict is returned. *Reul v. Wis. N. W. R. Co.* 166 Wis. 128, 163 N. W. 189; *Wiesman v. American Ins. Co.* 184 Wis. 523, 199 N. W. 55, 200 N. W. 304; *Henry v. La Grou,* 200 Wis. 110, 227 N. W. 246. Under that rule, on the appeal of the defendant corporation, the problem is

not the broader question of whether the findings of the learned circuit judge are more warranted by the evidence than the answers of the jury, but the inquiry is limited to the narrow issue of whether there is any credible evidence which, under any reasonable view, will admit of inferences which may have been drawn by the jury in finding that Haasch was not guilty of any negligence which was a proximate cause of injury to plaintiff."

Applicable here too are the principles declared in *Lewis v. Prien* (1897), 98 Wis. 87, 89, 90, 73 N. W. 654, that:

"The doctrine that obtains in some jurisdictions, that where the evidence preponderates so strongly one way that in case of a verdict otherwise it would be the duty of the court to set it aside and grant a new trial, a verdict should be directed, has not obtained a foothold here. The rule of this court is in accord with the weight of authority on the subject, including that of the federal supreme court. . . . 'The case should not be withdrawn from the jury unless the conclusion follows as a matter of law from the evidence, that no recovery can be had upon any view which could properly be taken of the facts the evidence tends to establish.' So it is said that the jury, in all cases where there may reasonably be opposing inferences from the evidence, are the exclusive judges to weigh such evidence and draw the proper inference."

We come now to a consideration of whether the plaintiff had waived his right to additional commissions on the Globe job. After verdict, the trial court granted the defendant's motion previously made for a directed verdict on the ground that the plaintiff as a matter of law had waived his right to any more commissions with respect to the Globe contract. In its decision, the trial court in part said:

"Plaintiff upon receiving his first check, made inquiry, and was told in uncertain terms what his commission earnings were, and how the figure was arrived at. He expected ten per cent (10%) but received two per cent (2%) and a fraction.

"He continued his employment and received checks which at most times never reached the ten per cent (10%) figure,

which he testified in court, was promised to him when he was hired by defendant. On one occasion he received a payment of sixteen and one-tenth per cent (16.1%).

"He made his attitude plain at all these times by continuing his employment without protest sufficient to warrant defendant in taking some steps to appease a dissatisfied salesman, who would not be an asset to its getting more business.

"Plaintiff testified that when he started to work for defendant he was told he would be paid ten per cent (10%) commission on all materials except carload shipment of firebrick, and higher commission on certain items up to twelve per cent (12%), and that no commission was paid on labor or time-and-material contracts. That upon his first disappointing check, Crichton told him, 'That's the commission we'll pay you,' he testified at the trial, 'I made my mind up that I would sue him when I leave the company.'

"In answer to a question: 'Did you give him any indication of suing him?' he answered, 'No.'

"He related then that he received a bonus for the years 1951 and 1952, and although ill and at home, he did not lose any commissions, that the defendant treated him as fairly as other employees.

"His conduct in continuing to work for defendant under a set of rules under which Crichton determined the commission on practically all orders obtained by him—as well as other salesmen—because of the different items involved which required an adjustment on account of the different margins of profit—was such that it gave no indication to defendant that he was dissatisfied, or harbored a plan to continue in the organization as a salesman with a lawsuit to be commenced at an opportune time.

". . . [checking] some of the cases cited by counsel, we find that the employee protested the employer's actions in not getting his wages, or had some correspondence or talks to induce employer to recede from its positions, or did something to give the employer continuous or some 'inkling' that he made claim for loss of wages. Not so, this plaintiff.

"He was aware of the business of defendant, which did not warrant a straight ten per cent (10%) commission on all items and knew the consequences of a salesman getting a commission at the selection of Crichton."

It is the position of the plaintiff that the trial court labored under a misapprehension of the evidence with respect to the matter of protest on his part, and that in deciding the motion for a directed verdict, the trial court did not take the view of the evidence most favorable to him in such respect.

There is evidence of record which the jury was entitled to deem credible to the effect that the plaintiff did not agree to or accept Crichton's decision with reference to the amount of commission that was first paid to him; that he talked to Crichton on subsequent occasions about the amounts that he received, but without satisfactory explanation from Crichton; that he remained in the defendant's employ because more commissions were due, and he believed that Crichton might change his mind; that each time commissions on the Globe job were received by the plaintiff, he challenged the amounts in conversation with Crichton; that plaintiff at the time made up his mind to sue when he was in a position to leave the defendant's employ. Crichton himself testified that he did not believe that Davies was satisfied with Crichton's explanation as to the amount of the first commission paid on the Globe job. Crichton testified that he personally took the greater portion of the commission on the first two billings of the Globe job. It is not disputed that Davies was unaware of such action by Crichton. It thus appears that Davies frequently gave expression to Crichton of his dissatisfaction with the amounts of commissions received by him on the first and subsequent Globe billings; that Davies had no knowledge that Crichton took commissions on the Globe job for himself; and that in his conversations with Crichton, Davies attempted to induce the defendant to recede from its position as to the amounts of commissions to which he was entitled on that job.

"Waiver" is defined as voluntary and intentional relinquishment of a known right. As said in *Nolop v. Spettel* (1954), 267 Wis. 245, 249, 64 N. W. (2d) 859:

" 'A waiver is the intentional relinquishment of a known right.' *Swedish American Nat. Bank v. Koebernick,* 136 Wis. 473, 479, 117 N. W. 1020. 'Since an intention to relinquish an existing right or advantage is generally regarded as an essential of a waiver, it follows that it must be shown by the party claiming a waiver that the person against whom the waiver is asserted had at the time knowledge, actual or constructive, of the existence of his rights or of the facts upon which they depended. Ignorance of a material fact negatives a waiver. Waiver cannot be established by a consent given under a mistake of fact.' 56 Am. Jur., Waiver, p. 114, sec. 14."

An employee's previous acceptance of wage payments does not necessarily bar his right to claim additional compensation, although it will, if he accepts them without objection, knowing that the employer regards them as payments in full. 56 C. J. S., Master and Servant, p. 539, sec. 108 (Waiver by, or Estoppel of, Employee).

The issue of waiver in the case at bar was raised by the defendant. Of record it appears that while the defendant had directed the trial court's attention to the issue of waiver, nevertheless the defendant did not request submission to the jury of any special question concerning that issue. In view of such procedure it must be assumed that the defendant took the position that either the court decide the issue as a matter of law on facts most favorable to the plaintiff, or that the jury consider factual matters relating to waiver in its determination of the question as to whether the plaintiff was entitled to additional compensation.

*Nelson v. Caddo-Texas Oil Lands Co.* (1922), 176 Wis. 327, 329, 186 N. W. 155, involved consideration of the waiver of accrued salary of a director of a corporation. The item of waiver was submitted to the jury as a question of fact. The court said:

"Intent to waive is an essential element of waiver. While the intent to waive may be inferred as a matter of law from

the conduct of the parties (*Pabst B. Co. v. Milwaukee,* 126 Wis. 110, 117, 105 N. W. 563), it is to be determined as a question of fact where the inference does not conclusively arise as a matter of law. *Robinson v. Pennsylvania F. Ins. Co.* 90 Me. 385, 38 Atl. 320; *Fishback v. Van Dusen,* 33 Minn. 111, 22 N. W. 244."

It is to be noted that in *Pabst Brewing Co. v. Milwaukee* (1905), 126 Wis. 110, 105 N. W. 563, alluded to in the quotation just above indicated, waiver was inferred as a matter of law in circumstances where a property owner had paid without protest a special-tax assessment. The court held that only one inference was present, viz., that he had intended to waive any right to protest the assessment.

At 31 C. J. S., Estoppel, pp. 463, 464, sec. 163 b., it is said:

"The question [of waiver] is one of fact for the jury where it is a matter of inference, or is to be established by the weight of evidence. If the established facts permit reasonable minds to differ as to the inferences or effects from them, a question of fact arises, to be determined by court or jury according as the parties see fit to submit the controversy for decision.

"On the other hand, when the necessary facts are undisputed, or are admitted or clearly established, waiver becomes a question of law. The question is one of law where but one inference can be drawn from the facts, and it is not error for the court to charge the jury that they constitute waiver. . . .

"*Intention.* The existence of the intention to waive the right or advantage in question, . . . is generally a question of fact. Where the intention is disputed, it necessarily becomes a question for the determination of the jury; it is for the jury to say what the conduct of the party against whom a waiver is claimed means or signifies."

No cases in this jurisdiction involving contentions as here, have come to our attention. While in *Dickinson v. Norwegian Plow Co.* (1898), 101 Wis. 157, 76 N. W. 1108, the employee was notified in October that his annual salary

was reduced by $300, and he protested such payment, but completed his year of service which terminated in the following June, and judgment was rendered for the amount not paid under the contract, the question of waiver of his right to collect the full salary was not raised.

The plaintiff relies largely on *Gibbons v. Brewster* (1947), 82 Cal. App. (2d) 435, 186 Pac. (2d) 459. The defendant submits that since estoppel and not waiver was there involved, the conclusions in that case are not applicable here. We cannot agree. 31 C. J. S., Estoppel, p. 245, sec. 61 b, points out:

"Waiver and estoppel or estoppel *in pais* are closely related; the line of demarcation between them is said to be very slight, since both partake of somewhat the same elements and ask essentially the same relief; and the terms are frequently and loosely used as convertible, especially where waivers implied, and estoppels arising, from conduct are involved, the dividing line being very shadowy in such cases and it being often a difficult question to determine just where the doctrine of implied waiver ends and that of estoppel begins. Where the waiver relied on is constructive, or merely implied from the conduct of a party, irrespective of what his actual intention may have been, it is at least questionable if there are not present some of the elements of estoppel. It has been declared on the one hand, that estoppel is a species of waiver and, on the other hand, that waiver belongs to the family, and, according to the judicial decisions on the subject, is in the nature, of estoppel."

In *Gibbons v. Brewster, supra,* the employee objected to the method adopted by the employer in calculating a bonus arrangement which differed from that which had been agreed to when the employment contract was made, and upon which revised basis the employee was paid less than under the original method. The evidence indicated that when the first payment under the new method was made, the employee objected. However, he accepted the payment as proffered.

Thereafter he accepted without protest three further payments computed under the new method before leaving the employ. After leaving, he sued for the balance due under the original method of calculation. The appellate court sustained the judgment of the trial court in favor of the employee. On appeal it was contended that (82 Cal. App. (2d) 440), "by appearing to acquiesce in the changed method of compensation and accepting without further protest three checks figured in that manner, plaintiff induced defendant to retain him in his employment. He is therefore estopped from now saying that he did not accede to the changed method of compensation and did not accept those checks in full payment for his services." Manifestly, the employer's claim that the employee was estopped from contending that he did not accede to the changed method, and did not accept the several checks in full payment of services, is not substantially different in effect than had the employer contended that the employee lead him to believe that he had waived his right to additional payments when he accepted the payments as presented and remained on the job, and that he was therefore estopped thereby. The appellate court stated (82 Cal. App. (2d) 441):

"An interpretation of the changed agreement here involved which would deprive respondent of 50 per cent of his former compensation would certainly be unfair and unjust, unless respondent had actually and unequivocally accepted its terms. When advised of the change, respondent protested, but was told by appellant that it was 'going to be that way, regardless.' The evidence produced points to the fact that there was never a meeting of the minds of the parties, hence respondent by accepting checks for the remaining several months of his employment without further protest, was not estopped from standing upon his original agreement with appellant."

The judgment was affirmed.

In principle the situation in *Gibbons v. Brewster, supra,* is not distinguishable from the case in bar.

In the instant matter the defendant contends that under the provisions of sec. 270.28, Stats., it is to be assumed that the trial court determined as a matter of fact that plaintiff had waived his right to additional commissions. Sec. 270.28 provides:

"Submission to jury; omitted essential fact. When some controverted matter of fact not brought to the attention of the trial court but essential to sustain the judgment is omitted from the verdict, such matter of fact shall be deemed determined by the court in conformity with its judgment and the failure to request a finding by the jury on such matter shall be deemed a waiver of jury trial *pro tanto.*"

The record plainly indicates that the trial court determined as a matter of law that the plaintiff had waived his right to additional commissions on the Globe job. Since the subject of waiver was brought to the attention of the trial court, it could not properly make findings of fact thereon either by sec. 270.28, Stats., or otherwise. See *Farmers' Co-operative P. Co. v. Boyd* (1922), 175 Wis. 544, 185 N. W. 234, wherein it was held that implied findings can support a judgment only in cases where the attention of the trial court has not been called to the issue.

It is the position of the plaintiff that the evidence does not establish waiver on his part (1) for the reason that he was unaware of Crichton's action in taking commissions for himself on the Globe job, and that had he possessed such knowledge, he would have been in better position to decide whether to stay or leave the employ, and (2) his continuance in the employ of the defendant after accepting commissions lower than such to which he was entitled, after protesting the amount, did not, as a matter of law constitute an intention to waive his contract rights.

With reference to the first of these contentions, it is to be observed that there is no evidence of record indicating that the plaintiff would have adopted a course different than that undertaken by him, had he been informed of Crichton's action in taking commissions for himself. Any finding with respect to such item would have been speculative. With respect to plaintiff's other contention, it must be held that upon the basis of the evidence most favorable to the plaintiff, it was error to determine that he had waived his rights to additional commissions as a matter of law.

The defendant admitted that plaintiff had protested the amount of the first commission payment on the Globe job, and that he apparently was not satisfied with Crichton's explanation as to the amount. The defendant presented evidence to the effect that the plaintiff accepted subsequent payments without protest, and remained in defendant's employ for a year and a half after the first payment was made. Were such the only facts here, standing alone, they would be insufficient to warrant a determination as a matter of law that the plaintiff had voluntarily relinquished his right to make claim for the full amount due under the contract. Any question of waiver in this cause was one of fact. By its verdict the jury was called upon to determine whether the plaintiff was "entitled" to additional commissions on the Globe job. Manifestly, such inquiry was broad in scope as to considerations involved. All of the evidence of record relating to waiver was before the jury. The jury was not directed to disregard it. It is to be assumed that the jury considered all evidence relating to waiver in its determination of the question. The defendant had requested no special question as to waiver, nor had it proposed instructions with reference to waiver. Had the jury on the basis of facts and inferences drawn from the evidence determined that the plaintiff had protested but once, and thereafter intended to

relinquish his right to additional commissions, it would have been justified under the terminology of the question in the verdict to have decided that the plaintiff was not entitled to additional commissions on the Globe job. The jury's declination to accept the plaintiff's view that the Globe job was a turnkey contract, did not require that it reject the plaintiff's evidence in other regards. In view of the record we are obliged to determine that the jury's verdict with respect to items relating to commissions on the Globe job may not be disturbed.

We next consider the defendant's contention that the plaintiff's claim for additional commissions on the first two Globe furnace-job invoices was barred by the statute of limitations, secs. 330.14 and 330.21 (5), Stats. 1951, which provide:

"330.14 ACTIONS, TIME FOR COMMENCING. The following actions must be commenced within the periods respectively hereinafter prescribed after the cause of action has accrued."

"330.21 WITHIN TWO YEARS. (5) Any action to recover unpaid salary, wages, or other compensation for personal services, except fees for professional services."

Invoice No. 6108 related to the east rotary furnace, bore date November 26, 1951, and was for $889.23. Invoice No. 6055 pertained to the reheat furnace, bore date November 14, 1951, and was for $17,712.07. The plaintiff was paid a commission of $463.35 on the $17,712.07 invoice, but never received a commission on the $889.23 invoice. Over objection by the defendant, the jury was permitted *inter alia* to consider the claim for additional commissions due plaintiff with respect to such invoices.

Specifically the issue is narrowed to a consideration of whether the plaintiff had a legal right to demand and to enforce payment of commissions by suit in the month follow-

ing the rendering of invoices by the defendant to Globe. Only if he had such right would the statute of limitations apply to the two invoices in question.

The plaintiff maintains that his contract with the defendant for compensation on the Globe job was "entire" and "indivisible," as was the contract between the defendant and Globe, and that actually he was not legally entitled to commissions until the job was completed and paid for, notwithstanding that partial payments were made to him as billings were sent to Globe. The defendant contends that the contract for compensation was "severable," with payments absolutely due in the month following the sending of the invoices to Globe.

The rule as to "entire" and "severable" employment contracts is set forth in 54 C. J. S., Limitations of Actions, p. 50, sec. 133, and provides:

"*Entire and severable contracts.* As against a cause of action to recover compensation for services rendered under an entire, indivisible contract, the statute begins to run when, and only when, the services are terminated or the work is completed although the work may consist of numerous parts or items and although the contract provides that the compensation shall be made at stated intervals or in instalments. . . . Where the contract of employment embraces several distinct items of service which can be and are separately performed and the compensation for each is settled and apportioned, the contract is severable, not entire, and as to each item a cause of action accrues and the statute begins to run when that particular service is rendered unless this would be an unreasonable construction of the contract."

In *Burns v. Mitchell* (1937), 55 Ga. App. 862, 863, 191 S. E. 870, the test of whether a contract is entire or severable is stated as follows:

" 'In determining whether a contract is entire or severable, the criterion is to be found in the question whether the whole quantity, service, or thing—all, as a whole—is of the essence

of the contract. If it appear that the contract was to take the whole or none, then the contract would be entire.' [Citations.] . . .

"'Where the matters specified in the claim are the outgrowth of an entire contract for continuous labor or services, the demand will be considered as an entire one' (17 R. C. L. 797), and, 'as against a cause of action to recover compensation for services rendered under an entire indivisible contract, the statute [of limitations] begins to run when and only when the services are terminated or the work is completed, although the work may consist of numerous parts or items, and although the contract provides that the compensation shall be made at stated intervals, or in instalments.' [Citations.]"

In *Ornstein v. Yahr & Lange Drug Co.* (1903), 119 Wis. 429, 431, 96 N. W. 826, it was said:

"The intent of the parties is manifest by the terms and condition of the agreement. A consideration thereof discloses the fact that the mutual obligations imposed were concurrent acts, requiring each party to perform his part, and that an entire fulfilment of the promise by either preceded the right to compel performance on the part of the other. The amount of the consideration to be paid by the appellant is certain and definite and is dependent upon the performance of the services by respondent for the fixed period. The services for the period defined are the consideration of the promise to pay the salary. Under these circumstances the benefits and value of the services for a part of the period cannot, in legal contemplation, be apportioned on a *pro rata* basis. If either party desired such an apportionment, he should have insisted that the terms of the agreement expressly provide for it. It is argued that the terms of the contract as written should be held apportionable upon the ground that the sums paid thereon by appellants were the *pro rata* amount for the service rendered before payment. This cannot control, since the terms of the agreement are plain and definite and readily understood under rules applicable to the construction of such agreements. It has frequently been held that, if there is an express promise to pay a definite sum as compensation for a prescribed period of service, it is an entire promise

made for the whole service of the contracted period, and if instalments are paid they are not in payment of so much of the services rendered to the date of payment, but are merely an advance of part payment for the whole period for the convenience of him receiving it. We must hold that the contract is entire."

Globe's contract with the defendant contemplated the furnishing of all materials for the furnaces, not a part thereof. It was on a basis of Globe taking all or none, and of the defendant being bound to furnish all. Manifestly, it was an entire contract. Delivery of the materials was to be made over a period of time. Considering the nature and purpose of the contract, it would be unreasonable to assume that payment was due before the contract was completed, notwithstanding that advances of part payment were made from time to time. That the salesmen's commissions were based on the amount of the entire contract seems clear from the testimony of Crichton, who, when referring to his own taking of a part of the first amount paid by Globe said: "I wasn't looking at this particular invoice as compensation for my work on the job. I had the whole order in mind, . . ." and "Well, I could have spread it over all of the invoices and taken a lesser amount." While it was the practice of the defendant to pay amounts to salesmen calculated on billings regardless of whether the customer remitted, it appears that such arrangement was in the nature of a drawing account. There is no evidence of record indicating that the amounts paid to the salesmen in the form of the commissions were not subject to adjustment at or before the time when the contract of the defendant with Globe terminated. The burden of establishing that the periodic commissions paid to the plaintiff were not subject to revision dependent on subsequent events, was upon the defendant company, since it interposed the defense that the limitation statute applied to the two amounts in question. We are of the opinion that the statute of limita-

tions did not begin to run until the defendant's contract with Globe was terminated, and that hence the plaintiff's claim regarding the two amounts in controversy, was not barred by provisions of secs. 330.14 and 330.21 (5), Stats. 1951.

We next consider whether the court improperly set aside the jury's finding that the plaintiff was entitled to 10 per cent commissions on gross receipts of the Bucyrus-Erie boiler-setting job. Here again are applicable the principles referred to in *Mueller v. O'Leary, supra; Trautmann v. Charles Schefft & Sons Co., supra,* and *Lewis v. Prien, supra.* The evidence in this regard has heretofore been outlined herein. There was a sharp conflict as to material particulars. The matters of credibility and weight were for the jury. We are constrained to hold that there is ample credible evidence to sustain the jury's finding, and that there is no reasonable basis appearing of record for declaring such finding to be perverse.

As to the Bucyrus-Erie contract, the defendant argues that since the plaintiff did not protest, nor claim a 10 per cent commission on said job when advised by Crichton that he would not receive a commission for same, he thereby waived his right to a 10 per cent commission. This contention is predicated on the premise that plaintiff knew from his previous experience with the defendant as to the Globe job, that commissions were limited to half of the defendant's profit, and that since the plaintiff did not complain when the Bucyrus-Erie matter was discussed, he lulled Crichton into a belief that he accepted Crichton's explanation. The defendant further contends that since the plaintiff waived his right to a 10 per cent commission, and did not at the trial establish the net profit to the company, he is barred from compensation as to the Bucyrus-Erie contract. We find no merit to these contentions. The defendant's premise is not sound for the reason that the plaintiff's evidence contradicted that of the defendant in respect to plaintiff's

knowledge that commissions were to be based on net profits. The jury obviously rejected the defendant's evidence with regard to such issue of fact. No question ·in the verdict with reference to claim of such waiver was requested by the defendant, and under the question submitted to the jury wherein inquiry was made as to whether the plaintiff was entitled to a commission of 10 per cent, the jury was justified in considering matters of waiver as here claimed. It was the defendant's position that at most the plaintiff would be entitled only to a commission of one half of defendant's net profits. The defendant presented no evidence with respect to its net profit. It was the defendant's burden to establish that under the circumstances the plaintiff was entitled to less than 10 per cent.

The trial court's determination that $1,057.40 was paid to the plaintiff through error cannot stand in view of the evidence and the finding of the jury with respect to the Bucyrus-Erie job.

We consider now the remaining issue presented. By its verdict the jury determined that the defendant did not suffer damages by reason of plaintiff's possession of certain of defendant's documents and records. In view of such finding the jury did not answer a further inquiry relating to the amount of damages for the claimed wrong.

The material facts with reference to this matter have heretofore been set forth. The defendant's appeal is from the denial of its motion for judgment notwithstanding the verdict with respect to the damages claimed. It submits that since its evidence was uncontradicted both as to the fact that damage was sustained, and that its loss amounted to a minimum of $800, the jury was obligated to render the verdict in defendant's favor in such particulars, and that having failed to so do, it was the court's duty to change the answers.

The defendant's evidence was not entirely uncontradicted. The plaintiff testified that certain of the invoices demanded

of him had never been in his possession. The jury rejected the defendant's evidence with reference to other items at issue in the cause, notably that concerning the computation of commission on the basis of net profits.

In *Estate of Bradbury* (1957), 275 Wis. 564, 567, 82 N. W. (2d) 804, this court speaking through Mr. Chief Justice MARTIN approved the view expressed in *Caballero v. Litchfield Wood-Working Co.* (1956), 246 Minn. 124, 129, 74 N. W. (2d) 404, 408, that:

"Clear, positive, direct, and undisputed testimony by an unimpeached witness, which is not in itself contradictory or improbable, cannot be rejected or disregarded by either court or jury, unless the evidence discloses facts and circumstances which furnish a reasonable ground for so doing. Such testimony can be rejected only when doubt is cast upon its truthfulness by contradictory or discrediting facts or circumstances. The testimony of a witness may be disregarded if it contains inherent improbabilities or contradictions which, alone or in connection with other circumstances in evidence, furnish a reasonable ground for concluding that the testimony is not true."

At 32 C. J. S., Evidence, p. 1094, sec. 1038, it is said:

"The common view is that evidence not directly contradicted is not necessarily binding on the triers of fact, and may, in proper circumstances, be disbelieved and given no weight, in whole or part, especially where the witness is a party or otherwise interested, some authorities holding that, in determining the legal significance of evidence, the testimony of interested parties is not to be regarded as undisputed."

In *Moore v. Ellis* (1894), 89 Wis. 108, 111, 61 N. W. 291, it was said:

"The appellant says that the undisputed evidence shows that the services rendered were worth more than the jury allowed him. It is to be borne in mind that the testimony which tended to prove the performance of these services, and their amount, and the circumstances under which they

were rendered, was the appellant's own testimony. The jury was not bound, as a matter of law, to credit the testimony of a witness so interested, given on his own behalf, even when uncontradicted by any other witness."

Since the defendant's evidence with respect to its claim in this regard was contradicted in part by plaintiff's evidence; and since other of defendant's evidence in the cause was rejected by the jury; and since the only testimony relating to the matter was presented by those in the employ of the defendant corporation who obviously were interested, it cannot be held that as a matter of law the defendant was entitled to findings in accordance with its claim. The jury's verdict under the circumstances was not improper or perverse. The trial court's decision with respect to this issue is sustained.

*By the Court.*—Judgment affirmed in so far as it directs dismissal of the second cause of action in defendant's counterclaim for damages alleged to have resulted from plaintiff's possession and withholding of documents, records, etc. In all other respects the judgment is reversed, and the cause remanded with directions to enter judgment upon the verdict of the jury. Costs for printing in excess of 50 pages in brief allowed.