**MARKET STREET ASSOCIATES LIMITED PARTNERSHIP and William Orenstein, Plaintiffs–Appellants,**

v.

**Dale FREY, et al., Defendants–Appellees.**

No. 90–3392.

United States Court of Appeals, Seventh Circuit.

Argued June 5, 1991.

Decided Aug. 27, 1991.

Michael B. Apfeld (argued), Jane C. Schlicht, William Duffin, Godfrey & Kahn, Milwaukee, Wis., for plaintiffs-appellants.

James W. Greer (argued), Diane S. Sykes, Bruce G. Arnold, Whyte & Hirschboeck, Milwaukee, Wis., for defendants-appellees.

Before CUMMINGS and POSNER, Circuit Judges, and NOLAND, Senior District Judge.*

POSNER, Circuit Judge.

Market Street Associates Limited Partnership and its general partner appeal from a judgment for the defendants, General Electric Pension Trust and its trustees, entered upon cross-motions for summary judgment in a diversity suit that pivots on the doctrine of "good faith" performance of a contract. Cf. Robert Summers, " 'Good Faith' in General Contract Law and the Sales Provisions of the Uniform Commercial Code," 54 *Va.L.Rev.* 195, 232–43 (1968). Wisconsin law applies—common law rather than Uniform Commercial Code, because the contract is for land rather than for goods, UCC § 2–102; Wis.Stat. § 402.-102, and because it is a lease rather than a sale and Wisconsin has not adopted UCC art. 2A, which governs leases. But before we can get to the substance of the dispute we need to consider a jurisdictional and a procedural question.

The suit was filed in a Wisconsin state court and removed to federal district court. The defendants were required in the petition for removal to set forth the facts establishing federal jurisdiction. 28 U.S.C. § 1446(a). Mistakenly believing that the only citizenships that count in the case of a limited partnership are those of the partnership itself and of its general partners, the defendants contented themselves with alleging that the plaintiff is a Wisconsin limited partnership, that its sole general partner is a citizen of Wisconsin, and that none of the defendants is a citizen of that state. In fact, for purposes of deciding whether a suit by or against a limited partnership satisfies the requirement of complete diversity of citizenship—that no party on one side of the case may be a citizen of the same state as any party on the other side—the citizenship of all the limited partners, as well as of the general partner, counts. *Carden v. Arkoma Associates*, 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990). Although *Carden* was decided after the present suit was removed to federal district court, the rule adopted in that case had been the law of this circuit since *Elston Investment, Ltd. v. David Altman Leasing Corp.*, 731 F.2d 436 (7th Cir.1984). Later cases reiterating the rule include *Northern Trust Co. v. Bunge Corp.*, 899 F.2d 591, 594 (7th Cir.1990); *F. & H.R. Farman–Farmaian Consulting Engineers Firm v. Harza Engineering Co.*, 882 F.2d 281, 284 (7th Cir.1989), and *Stockman v. LaCroix*, 790 F.2d 584, 587 (7th Cir.1986). Even when the appeal was argued, more than a year after *Carden* came down, the parties' lawyers were unaware of the rule; indeed they seemed astonished at the suggestion that the citi-

* Hon. James E. Noland, of the Southern District of Indiana, sitting by designation.

zenship of the limited partners was relevant to jurisdiction.

After the oral argument, we directed the parties to submit affidavits concerning the citizenship of the limited partners *and* that of the individual defendants, the trustees, for it is their citizenship, not that of the trust, that counts for diversity purposes. *Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980); *Goldstick v. ICM Realty*, 788 F.2d 456, 458 (7th Cir.1986). All that the record contained on that score was an allegation that none of the defendants is a citizen of Wisconsin, which would not be good enough should it turn out that some of the limited partners are nonresidents of Wisconsin as well.

We have now received the submissions and determined that there is complete diversity of citizenship; although not all of the limited partners are Wisconsinites, none of them is a citizen of the same state as any of the trustees. But by their *insouciance* concerning jurisdiction the litigants not only ran the risk of having to start the case over in state court but also made more work for us and delayed the decision of the appeal. We remind the bench and bar of this circuit that it is their nondelegable duty to police the limits of federal jurisdiction with meticulous care and to be particularly alert for jurisdictional problems in diversity cases in which one or more of the parties is neither an individual nor a corporation. For it is with respect to the other, the unconventional entities—two of which, a partnership and a trust, are involved in this case—that mistakes concerning the existence of diversity jurisdiction are most common. Among other unconventional entities that lawyers and judges in diversity suits should be wary of tripping over are joint ventures, joint stock companies, labor unions, religious and charitable organizations, municipal corporations and other public and quasi-public agencies, and the governing boards of unincorporated institutions. For a partial list, see 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3630, at pp. 682–89 (2d ed. 1984).

The procedural question is whether, as the pension trust argues, Market Street Associates waived its right to a trial by moving for summary judgment and arguing in support of the motion that there were no genuine issues of material fact. That motion was filed in response to the pension trust's own motion for summary judgment, which the judge granted. If the pension trust is right, all that Market Street Associates can argue on appeal is that it was entitled to judgment as a matter of law—not that it was entitled to a trial.

The pension trust is wrong. Moving for summary judgment is not a waiver of the right to a trial if the motion is denied. It is true that the moving party must claim that there are no genuine issues of material fact, for if there are, summary judgment is improper. But if the judge disagrees, it doesn't mean that the party loses the whole case on the spot; it just means that he cannot avoid a trial, as he had hoped to do by filing the motion.

The principle is the same if both parties move for summary judgment. *Zook v. Brown*, 748 F.2d 1161, 1166 (7th Cir.1984); *Case & Co. v. Board of Trade*, 523 F.2d 355, 360 (7th Cir.1975). Each party will be arguing that the facts are so one-sided in his favor that there is no need for a trial, but if the judge disagrees, neither party has waived the right to a trial. The filing of cross motions for summary judgment must be distinguished from the case in which the parties stipulate that the judge may enter final judgment on the record compiled in the summary judgment proceedings. *May v. Evansville–Vanderburgh School Corp.*, 787 F.2d 1105, 1115–16 (7th Cir.1986); *Lac Courte Oreilles Band v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983); *Nielsen v. Western Electric Co.*, 603 F.2d 741, 743 (8th Cir.1979); *Starsky v. Williams*, 512 F.2d 109, 112–13 (9th Cir. 1975). If they do that, they waive their right to a trial. There was no such stipulation here.

All this is settled law. The pension trust's counsel should no more have argued that Market Street Associates waived its right to a trial then he should have re-

moved the case to federal court without ascertaining that the court would have jurisdiction.

■ We come at last to the contract dispute out of which the case arises. In 1968, J.C. Penney Company, the retail chain, entered into a sale and leaseback arrangement with General Electric Pension Trust in order to finance Penney's growth. Under the arrangement Penney sold properties to the pension trust which the trust then leased back to Penney for a term of 25 years. Paragraph 34 of the lease entitles the lessee to "request Lessor [the pension trust] to finance the costs and expenses of construction of additional Improvements upon the Premises," provided the amount of the costs and expenses is at least $250,000. Upon receiving the request, the pension trust "agrees to give reasonable consideration to providing the financing of such additional Improvements and Lessor and Lessee shall negotiate in good faith concerning the construction of such Improvements and the financing by Lessor of such costs and expenses." Paragraph 34 goes on to provide that, should the negotiations fail, the lessee shall be entitled to repurchase the property at a price roughly equal to the price at which Penney sold it to the pension trust in the first place, plus 6 percent a year for each year since the original purchase. So if the average annual appreciation in the property exceeded 6 percent, a breakdown in negotiations over the financing of improvements would entitle Penney to buy back the property for less than its market value (assuming it had sold the property to the pension trust in the first place at its then market value).

One of these leases was for a shopping center in Milwaukee. In 1987 Penney assigned this lease to Market Street Associates, which the following year received an inquiry from a drugstore chain that wanted to open a store in the shopping center, provided (as is customary) that Market Street Associates built the store for it. Whether Market Street Associates was pessimistic about obtaining financing from the pension trust, still the lessor of the shopping center, or for other reasons, it initially sought financing for the project from other sources. But they were unwilling to lend the necessary funds without a mortgage on the shopping center, which Market Street Associates could not give because it was not the owner but only the lessee. It decided therefore to try to buy the property back from the pension trust. Market Street Associates' general partner, Orenstein, tried to call David Erb of the pension trust, who was responsible for the property in question. Erb did not return his calls, so Orenstein wrote him, expressing an interest in buying the property and asking him to "review your file on this matter and call me so that we can discuss it further." At first, Erb did not reply. Eventually Orenstein did reach Erb, who promised to review the file and get back to him. A few days later an associate of Erb called Orenstein and indicated an interest in selling the property for $3 million, which Orenstein considered much too high.

That was in June of 1988. On July 28, Market Street Associates wrote a letter to the pension trust formally requesting funding for $2 million in improvements to the shopping center. The letter made no reference to paragraph 34 of the lease; indeed, it did not mention the lease. The letter asked Erb to call Orenstein to discuss the matter. Erb, in what was becoming a habit of unresponsiveness, did not call. On August 16, Orenstein sent a second letter—certified mail, return receipt requested—again requesting financing and this time referring to the lease, though not expressly to paragraph 34. The heart of the letter is the following two sentences: "The purpose of this letter is to ask again that you advise us immediately if you are willing to provide the financing pursuant to the lease. If you are willing, we propose to enter into negotiation to amend the ground lease appropriately." The very next day, Market Street Associates received from Erb a letter, dated August 10, turning down the original request for financing on the ground that it did not "meet our current investment criteria": the pension trust was not interested in making loans for less than $7 million. On August 22, Orenstein replied to Erb by

letter, noting that his letter of August 10 and Erb's letter of August 16 had evidently crossed in the mails, expressing disappointment at the turn-down, and stating that Market Street Associates would seek financing elsewhere. That was the last contact between the parties until September 27, when Orenstein sent Erb a letter stating that Market Street Associates was exercising the option granted it by paragraph 34 to purchase the property upon the terms specified in that paragraph in the event that negotiations over financing broke down.

The pension trust refused to sell, and this suit to compel specific performance followed. Apparently the price computed by the formula in paragraph 34 is only $1 million. The market value must be higher, or Market Street Associates wouldn't be trying to coerce conveyance at the paragraph 34 price; whether it is as high as $3 million, however, the record does not reveal.

The district judge granted summary judgment for the pension trust on two grounds that he believed to be separate although closely related. The first was that, by failing in its correspondence with the pension trust to mention paragraph 34 of the lease, Market Street Associates had prevented the negotiations over financing that are a condition precedent to the lessee's exercise of the purchase option from taking place. Second, this same failure violated the duty of good faith, which the common law of Wisconsin, as of other states, reads into every contract. *In re Estate of Chayka*, 47 Wis.2d 102, 107, 176 N.W.2d 561, 564 (1970); *Super Valu Stores, Inc. v. D–Mart Food Stores, Inc.*, 146 Wis.2d 568, 577, 431 N.W.2d 721, 726 (App.1988); *Ford Motor Co. v. Lyons*, 137 Wis.2d 397, 442, 405 N.W.2d 354, 372 (App. 1987); *Sunds Defibrator AB v. Beloit Corp.*, 930 F.2d 564, 566 (7th Cir.1991); *Restatement (Second) of Contracts* § 205 (1981); 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 7.17a (1990). In support of both grounds the judge emphasized a statement by Orenstein in his deposition that it had occurred to him that Erb mightn't know about paragraph 34, though this was

unlikely (Orenstein testified) because Erb or someone else at the pension trust would probably check the file and discover the paragraph and realize that if the trust refused to negotiate over the request for financing, Market Street Associates, as Penney's assignee, would be entitled to walk off with the property for (perhaps) a song. The judge inferred that Market Street Associates didn't want financing from the pension trust—that it just wanted an opportunity to buy the property at a bargain price and hoped that the pension trust wouldn't realize the implications of turning down the request for financing. Market Street Associates should, the judge opined, have advised the pension trust that it was requesting financing pursuant to paragraph 34, so that the trust would understand the penalty for refusing to negotiate.

We begin our analysis by setting to one side two extreme contentions by the parties. The pension trust argues that the option to purchase created by paragraph 34 cannot be exercised until negotiations over financing break down; there were no negotiations; therefore they did not break down; therefore Market Street Associates had no right to exercise the option. This argument misreads the contract. Although the option to purchase is indeed contingent, paragraph 34 requires the pension trust, upon demand by the lessee for the financing of improvements worth at least $250,000, "to give reasonable consideration to providing the financing." The lessor who fails to give reasonable consideration and thereby prevents the negotiations from taking place is breaking the contract; and a contracting party cannot be allowed to use his own breach to gain an advantage by impairing the rights that the contract confers on the other party. *Variance, Inc. v. Losinske*, 71 Wis.2d 31, 40, 237 N.W.2d 22, 26 (1976); *Ethyl Corp. v. United Steelworkers of America*, 768 F.2d 180, 185 (7th Cir.1985); *Spanos v. Skouras Theatres Corp.*, 364 F.2d 161, 169 (2d Cir. 1966) (en banc) (Friendly, J.); 3A *Corbin on Contracts* § 767, at p. 540 (1960). Often, it is true, if one party breaks the contract, the other can walk away from it

without liability, can in other words exercise self-help. *First National Bank v. Continental Illinois National Bank*, 933 F.2d 466, 469 (7th Cir.1991). But he is not required to follow that course. He can stand on his contract rights.

But what exactly are those rights in this case? The contract entitles the lessee to reasonable consideration of its request for financing, and only if negotiations over the request fail is the lessee entitled to purchase the property at the price computed in accordance with paragraph 34. It might seem therefore that the proper legal remedy for a lessor's breach that consists of failure to give the lessee's request for financing reasonable consideration would not be an order that the lessor sell the property to the lessee at the paragraph 34 price, but an order that the lessor bargain with the lessee in good faith. But we do not understand the pension trust to be arguing that Market Street Associates is seeking the wrong remedy. We understand it to be arguing that Market Street Associates has no possible remedy. That is an untenable position.

Market Street Associates argues, with equal unreason as it seems to us, that it could not have broken the contract because paragraph 34 contains no express requirement that in requesting financing the lessee mention the lease or paragraph 34 or otherwise alert the lessor to the consequences of his failing to give reasonable consideration to granting the request. There is indeed no such requirement (all that the contract requires is a demand). But no one says there is. The pension trust's argument, which the district judge bought, is that either as a matter of simple contract interpretation or under the compulsion of the doctrine of good faith, a provision requiring Market Street Associates to remind the pension trust of paragraph 34 should be read into the lease.

■ It seems to us that these are one ground rather than two. A court has to have a reason to interpolate a clause into a contract. The only reason that has been suggested here is that it is necessary to prevent Market Street Associates from reaping a reward for what the pension trust believes to have been Market Street's bad faith. So we must consider the meaning of the contract duty of "good faith." The Wisconsin cases are cryptic as to its meaning though emphatic about its existence, so we must cast our net wider. We do so mindful of Learned Hand's warning, that "such words as 'fraud,' 'good faith,' 'whim,' 'caprice,' 'arbitrary action,' and 'legal fraud' ... obscure the issue." *Thompson–Starrett Co. v. La Belle Iron Works*, 17 F.2d 536, 541 (2d Cir.1927). Indeed they do. Summers, *supra*, at 207–20; 2 *Farnsworth on Contracts*, supra, § 7.17a, at pp. 328–32. The particular confusion to which the vaguely moralistic overtones of "good faith" give rise is the belief that every contract establishes a fiduciary relationship. A fiduciary is required to treat his principal as if the principal were he, and therefore he may not take advantage of the principal's incapacity, ignorance, inexperience, or even naïveté. *Olympia Hotels Corp. v. Johnson Wax Development Corp.*, 908 F.2d 1363, 1373–74 (7th Cir. 1990); *United States v. Dial*, 757 F.2d 163, 168 (7th Cir.1985); *Faultersack v. Clintonville Sales Corp.*, 253 Wis. 432, 435–37, 34 N.W.2d 682, 683–84 (1948); *Schweiger v. Loewi & Co.*, 65 Wis.2d 56, 64–65, 221 N.W.2d 882, 888 (1974); *Meinhard v. Salmon*, 249 N.Y. 458, 463–64, 164 N.E. 545, 546 (1928) (Cardozo, C.J.). If Market Street Associates were the fiduciary of General Electric Pension Trust, then (we may assume) it could not take advantage of Mr. Erb's apparent ignorance of paragraph 34, however exasperating Erb's failure to return Orenstein's phone calls was and however negligent Erb or his associates were in failing to read the lease before turning down Orenstein's request for financing.

But it is unlikely that Wisconsin wishes, in the name of good faith, to make every contract signatory his brother's keeper, especially when the brother is the immense and sophisticated General Electric Pension Trust, whose lofty indifference to small (= < $7 million) transactions is the signifier of its grandeur. In fact the law contemplates that people frequently will take ad-

vantage of the ignorance of those with whom they contract, without thereby incurring liability. *Restatement, supra,* § 161, comment d. The duty of honesty, of good faith even expansively conceived, is not a duty of candor. You can make a binding contract to purchase something you know your seller undervalues. *Laidlaw v. Organ,* 15 U.S. (2 Wheat.) 178, 181 n. 2, 4 L.Ed. 214 (1817); *Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 528 (7th Cir.1985); *United States v. Dial, supra,* 757 F.2d at 168; 1 *Farnsworth on Contracts, supra,* § 4.11, at pp. 406–10; Anthony T. Kronman, "Mistake, Disclosure, Information, and the Law of Contracts," 7 *J. Legal Stud.* 1 (1978). That of course is a question about formation, not performance, and the particular duty of good faith under examination here relates to the latter rather than to the former. But even after you have signed a contract, you are not obliged to become an altruist toward the other party and relax the terms if he gets into trouble in performing his side of the bargain. *Kham & Nate's Shoes No. 2, Inc. v. First Bank,* 908 F.2d 1351, 1357 (7th Cir.1990). Otherwise mere difficulty of performance would excuse a contracting party—which it does not. *Northern Indiana Public Service Co. v. Carbon County Coal Co.,* 799 F.2d 265, 276–78 (7th Cir.1986); *Jennie–O Foods, Inc. v. United States,* 217 Ct.Cl. 314, 580 F.2d 400, 409 (1978) (per curiam); 2 *Farnsworth on Contracts, supra,* § 7.17a, at p. 330.

But it is one thing to say that you can exploit your superior knowledge of the market—for if you cannot, you will not be able to recoup the investment you made in obtaining that knowledge—or that you are not required to spend money bailing out a contract partner who has gotten into trouble. It is another thing to say that you can take deliberate advantage of an oversight by your contract partner concerning his rights under the contract. Such taking advantage is not the exploitation of superior knowledge or the avoidance of unbargained-for expense; it is sharp dealing. Like theft, it has no social product, and also like theft it induces costly defensive expenditures, in the form of overelaborate disclaimers or investigations into the trustworthiness of a prospective contract partner, just as the prospect of theft induces expenditures on locks. See generally Steven J. Burton, "Breach of Contract and the Common Law Duty to Perform in Good Faith," 94 *Harv.L.Rev.* 369, 393 (1980).

The form of sharp dealing that we are discussing might or might not be actionable as fraud or deceit. That is a question of tort law and there the rule is that if the information is readily available to both parties the failure of one to disclose it to the other, even if done in the knowledge that the other party is acting on mistaken premises, is not actionable. *Kamuchey v. Trzesniewski,* 8 Wis.2d 94, 98 N.W.2d 403 (1959); *Southard v. Occidental Life Ins. Co.,* 36 Wis.2d 708, 154 N.W.2d 326 (1967); *Lenzi v. Morkin,* 103 Ill.2d 290, 82 Ill.Dec. 644, 469 N.E.2d 178 (1984); *Guyer v. Cities Service Oil Co.,* 440 F.Supp. 630 (E.D.Wis. 1977); W. Page Keeton *et al., Prosser and Keeton on the Law of Torts* § 106, at p. 737 (5th ed. 1984). All of these cases, however, with the debatable exception of *Guyer,* involve failure to disclose something in the negotiations leading up to the signing of the contract, rather than failure to disclose after the contract has been signed. (*Guyer* involved failure to disclose during the negotiations leading up to a renewal of the contract.) The distinction is important, as we explained in *Maksym v. Loesch,* 937 F.2d 1237, 1242 (7th Cir.1991). Before the contract is signed, the parties confront each other with a natural wariness. Neither expects the other to be particularly forthcoming, and therefore there is no deception when one is not. Afterwards the situation is different. The parties are now in a cooperative relationship the costs of which will be considerably reduced by a measure of trust. So each lowers his guard a bit, and now silence is more apt to be deceptive. Cf. *AM-PAT/Midwest, Inc. v. Illinois Tool Works Inc.,* 896 F.2d 1035, 1040–41 (7th Cir.1990).

Moreover, this is a contract case rather than a tort case, and conduct that might not rise to the level of fraud may nonetheless violate the duty of good faith in

dealing with one's contractual partners and thereby give rise to a remedy under contract law. Burton, *supra*, at 372 n. 17. This duty is, as it were, halfway between a fiduciary duty (the duty of *utmost* good faith) and the duty merely to refrain from active fraud. Despite its moralistic overtones it is no more the injection of moral principles into contract law than the fiduciary concept itself is. *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1152 (D.C.Cir.1984); Summers, *supra*, at 204–07, 265–66. It would be quixotic as well as presumptuous for judges to undertake through contract law to raise the ethical standards of the nation's business people. The concept of the duty of good faith like the concept of fiduciary duty is a stab at approximating the terms the parties would have negotiated had they foreseen the circumstances that have given rise to their dispute. The parties want to minimize the costs of performance. To the extent that a doctrine of good faith designed to do this by reducing defensive expenditures is a reasonable measure to this end, interpolating it into the contract advances the parties' joint goal.

It is true that an essential function of contracts is to allocate risk, and would be defeated if courts treated the materializing of a bargained-over, allocated risk as a misfortune the burden of which is required to be shared between the parties (as it might be within a family, for example) rather than borne entirely by the party to whom the risk had been allocated by mutual agreement. But contracts do not just allocate risk. They also (or some of them) set in motion a cooperative enterprise, which may to some extent place one party at the other's mercy. "The parties to a contract are embarked on a cooperative venture, and a minimum of cooperativeness in the event unforeseen problems arise at the performance stage is required even if not an explicit duty of the contract." *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc., supra*, 896 F.2d at 1041. The office of the doctrine of good faith is to forbid the kinds of opportunistic behavior that a mutually dependent, cooperative relationship might enable in the absence of rule.

"'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Kham & Nate's Shoes No. 2, Inc. v. First Bank, supra*, 908 F.2d at 1357. The contractual duty of good faith is thus not some newfangled bit of welfare-state paternalism or (*pace* Duncan Kennedy, "Form and Substance in Private Law Adjudication," 89 *Harv.L.Rev.* 1685, 1721 (1976)) the sediment of an altruistic strain in contract law, and we are therefore not surprised to find the essentials of the modern doctrine well established in nineteenth-century cases, a few examples being *Bush v. Marshall*, 47 U.S. (6 How.) 284, 291, 12 L.Ed. 440 (1848); *Chicago, Rock Island & Pac. R.R. v. Howard*, 74 U.S. (7 Wall.) 392, 413, 19 L.Ed. 117 (1868); *Marsh v. Masterson*, 101 N.Y. 401, 410–11, 5 N.E. 59, 63 (1886), and *Uhrig v. Williamsburg City Fire Ins. Co.*, 101 N.Y. 362, 4 N.E. 745 (1886).

The emphasis we are placing on postcontractual versus precontractual conduct helps explain the pattern that is observed when the duty of contractual good faith is considered in all its variety, encompassing not only good faith in the *performance* of a contract but also good faith in its *formation*, Summers, *supra*, at 220–32, and in its *enforcement*. *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 363 (7th Cir.1990). The formation or negotiation stage is precontractual, and here the duty is minimized. It is greater not only at the performance but also at the enforcement stage, which is also postcontractual. "A party who hokes up a phony defense to the performance of his contractual duties and then when that defense fails (at some expense to the other party) tries on another defense for size can properly be said to be acting in bad faith." *Id.;* see also *Larson v. Johnson*, 1 Ill.App.2d 36, 46, 116 N.E.2d 187, 191–92 (1953). At the formation of the contract the parties are dealing in present realities; performance still lies in the future. As performance unfolds, circumstances change, often unforeseeably; the

explicit terms of the contract become progressively less apt to the governance of the parties' relationship; and the role of implied conditions—and with it the scope and bite of the good-faith doctrine—grows.

We could of course do without the term "good faith," and maybe even without the doctrine. We could, as just suggested, speak instead of implied conditions necessitated by the unpredictability of the future at the time the contract was made. Farnsworth, "Good Faith Performance and Commercial Reasonableness under the Uniform Commercial Code," 30 *U.Chi.L.Rev.* 666, 670 (1963). Suppose a party has promised work to the promisee's "satisfaction." As Learned Hand explained, "he may refuse to look at the work, or to exercise any real judgment on it, in which case he has prevented performance and excused the condition." *Thompson–Starrett Co. v. La Belle Iron Works, supra,* 17 F.2d at 541. See also *Morin Building Products Co. v. Baystone Construction, Inc.,* 717 F.2d 413, 415 (7th Cir.1983). That is, it was an implicit condition that the promisee examine the work to the extent necessary to determine whether it was satisfactory; otherwise the performing party would have been placing himself at the complete mercy of the promisee. The parties didn't write this condition into the contract either because they thought such behavior unlikely or failed to foresee it altogether. In just the same way—to switch to another familiar example of the operation of the duty of good faith—parties to a requirements contract surely do not intend that if the price of the product covered by the contract rises, the buyer shall be free to increase his "requirements" so that he can take advantage of the rise in the market price over the contract price to resell the product on the open market at a guaranteed profit. *Empire Gas Corp. v. American Bakeries Co.,* 840 F.2d 1333 (7th Cir.1988). If they fail to insert an express condition to this effect, the court will read it in, confident that the parties would have inserted the condition if they had known what the future held. Of similar character is the implied condition that an exclusive dealer will use his best efforts to promote the supplier's goods, since otherwise the exclusive feature of the dealership contract would place the supplier at the dealer's mercy. *Wood v. Duff–Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917) (Cardozo, J.).

But whether we say that a contract shall be deemed to contain such implied conditions as are necessary to make sense of the contract, or that a contract obligates the parties to cooperate in its performance in "good faith" to the extent necessary to carry out the purposes of the contract, comes to much the same thing. They are different ways of formulating the overriding purpose of contract law, which is to give the parties what they would have stipulated for expressly if at the time of making the contract they had had complete knowledge of the future and the costs of negotiating and adding provisions to the contract had been zero.

The two formulations would have different meanings only if "good faith" were thought limited to "honesty in fact," an interpretation perhaps permitted but certainly not compelled by the Uniform Commercial Code, see Summers, *supra,* at 207–20—and anyway this is not a case governed by the UCC. We need not pursue this issue. The dispositive question in the present case is simply whether Market Street Associates tried to trick the pension trust and succeeded in doing so. If it did, this would be the type of opportunistic behavior in an ongoing contractual relationship that would violate the duty of good faith performance however the duty is formulated. There is much common sense in Judge Reynolds' conclusion that Market Street Associates did just that. The situation as he saw it was as follows. Market Street Associates didn't want financing from the pension trust (initially it had looked elsewhere, remember), and when it learned it couldn't get the financing without owning the property, it decided to try to buy the property. But the pension trust set a stiff price, so Orenstein decided to trick the pension trust into selling at the bargain price fixed in paragraph 34 by requesting financing and hoping that the pension trust would turn the request down

without noticing the paragraph. His preliminary dealings with the pension trust made this hope a realistic one by revealing a sluggish and hidebound bureaucracy unlikely to have retained in its brontosaurus's memory, or to be able at short notice to retrieve, the details of a small lease made twenty years earlier. So by requesting financing without mentioning the lease Market Street Associates might well precipitate a refusal before the pension trust woke up to paragraph 34. It is true that Orenstein's second letter requested financing "pursuant to the lease." But when the next day he received a reply to his first letter indicating that the pension trust was indeed oblivious to paragraph 34, his response was to send a lulling letter designed to convince the pension trust that the matter was closed and could be forgotten. The stage was set for his thunderbolt: the notification the next month that Market Street Associates was taking up the option in paragraph 34. Only then did the pension trust look up the lease and discover that it had been had.

The only problem with this recital is that it construes the facts as favorably to the pension trust as the record will permit, and that of course is not the right standard for summary judgment. The facts must be construed as favorably to the nonmoving party, to Market Street Associates, as the record permits (that Market Street Associates filed its own motion for summary judgment is irrelevant, as we have seen). When that is done, a different picture emerges. On Market Street Associates' construal of the record, $3 million was a grossly excessive price for the property, and while $1 million might be a bargain it would not confer so great a windfall as to warrant an inference that if the pension trust had known about paragraph 34 it never would have turned down Market Street Associates' request for financing cold. And in fact the pension trust may have known about paragraph 34, and either it didn't care or it believed that unless the request mentioned that paragraph the pension trust would incur no liability by turning it down. Market Street Associates may have assumed and have been entitled to assume that in reviewing a request for financing from one of its lessees the pension trust would take the time to read the lease to see whether it bore on the request. Market Street Associates did not desire financing from the pension trust initially—that is undeniable—yet when it discovered that it could not get financing elsewhere unless it had the title to the property it may have realized that it would have to negotiate with the pension trust over financing before it could hope to buy the property at the price specified in the lease.

On this interpretation of the facts there was no bad faith on the part of Market Street Associates. It acted honestly, reasonably, without ulterior motive, in the face of circumstances as they actually and reasonably appeared to it. The fault was the pension trust's incredible inattention, which misled Market Street Associates into believing that the pension trust had no interest in financing the improvements regardless of the purchase option. We do not usually excuse contracting parties from failing to read and understand the contents of their contract; and in the end what this case comes down to—or so at least it can be strongly argued—is that an immensely sophisticated enterprise simply failed to read the contract. On the other hand, such enterprises make mistakes just like the rest of us, and deliberately to take advantage of your contracting partner's mistake during the performance stage (for we are not talking about taking advantage of superior knowledge at the formation stage) is a breach of good faith. To be able to correct your contract partner's mistake at zero cost to yourself, and decide not to do so, is a species of opportunistic behavior that the parties would have expressly forbidden in the contract had they foreseen it. The immensely long term of the lease amplified the possibility of errors but did not license either party to take advantage of them.

The district judge jumped the gun in choosing between these alternative characterizations. The essential issue bearing on Market Street Associates' good faith was Orenstein's state of mind, a type of inquiry that ordinarily cannot be concluded on sum-

mary judgment, and could not be here. If Orenstein believed that Erb knew or would surely find out about paragraph 34, it was not dishonest or opportunistic to fail to flag that paragraph, or even to fail to mention the lease, in his correspondence and (rare) conversations with Erb, especially given the uninterest in dealing with Market Street Associates that Erb fairly radiated. To decide what Orenstein believed, a trial is necessary. As for the pension trust's intimation that a bench trial (for remember that this is an equity case, since the only relief sought by the plaintiff is specific performance) will add no illumination beyond what the summary judgment proceeding has done, this overlooks the fact that at trial the judge will for the first time have a chance to see the witnesses whose depositions he has read, to hear their testimony elaborated, and to assess their believability.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.