**NORTHERN CROSSARM, INC., Plaintiff,**

v.

**CHEMICAL SPECIALTIES, INC., Defendant.**

**No. 03–C–0415–C.**

United States District Court, W.D. Wisconsin.

July 11, 2004.

1182

Gregory T. Everts, Madison, WI, for Plaintiff.

Mary C. Turke, Jon G. Furlow, Michael Best & Freidrich, LLP, Madison, WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

In this civil case for money damages, plaintiff Northern Crossarm, Inc. contends that defendant Chemical Specialties, Inc. violated its duty of good faith and fair dealing under a marketing support agreement it had with plaintiff. The dispute arises out of an unusual set of circumstances. For many years, the wood treating industry relied on chromated copper arsenate (CCA) as a preservative for exposed wood. Defendant and two other companies were the major sellers of CCA to wood treaters such as plaintiff that apply preservatives to lumber and sell the treated product to retail outlets. In 1990, defendant acquired the rights to sell a product known as ACQ (alkaline copper quaternary) from Domtar, Inc., a Canadian company. ACQ contains none of the substances on the Environmental Protection Agency's list of hazardous substances. By contrast, CCA contains two listed substances: arsenic and chromium. Defendant wanted to promote ACQ, while continuing to sell CCA. Plaintiff began buying both ACQ and CCA from defendant and became a major booster of ACQ and a strong voice against the continued use of CCA.

In May 1998, plaintiff negotiated an ACQ supply agreement with defendant. Plaintiff had asked for an exclusive agreement; defendant rejected this request but eventually agreed to a long term supply agreement and, in addition, a "market support agreement," under which defendant agreed to pay plaintiff $.50 a pound for every pound of ACQ sold to any treater other than plaintiff in plaintiff's region, which the parties defined as including Minnesota, Iowa, South Dakota and the Upper Peninsula of Michigan, as well as Wisconsin. The agreement was to run for five years from November 18, 1998 and it permitted defendant to review and adjust the marketing support program annually.

Although the parties did not specify in the agreement that it referred to sales that defendant made in the area, neither party contemplated the possibility of sales by anyone else. In late 2000, however, Osmose, Inc., defendant's competitor in the chemical supply business, approached defendant to inquire about a license to manufacture and sell ACQ throughout North America. Up to that point, Osmose had been vocal in its opposition to the use of ACQ. In March 2001, defendant sublicensed its ACQ technology to Osmose in return for a royalty payment on each pound of ACQ Osmose sold. Defendant announced its licensing agreement to the public and to all of its customers, including plaintiff.

Defendant made no arrangements for plaintiff in its agreement with Osmose. In 2002, Menards, a chain retailer, started selling lumber treated with ACQ that Osmose had furnished to Menards' wholly owned wood treater. Although Osmose sold millions of pounds of ACQ to Menards' wood treater before the marketing support agreement ended, defendant did not pay plaintiff $.50 a pound for the ACQ that Osmose sold in plaintiff's region. On January 30, 2003, plaintiff told defendant that it expected market support payments from defendant for the ACQ Osmose had sold in plaintiff's region. Defendant re-

fused to make the payments and plaintiff sued.

In this suit, defendant took the position that the market support agreement required it to make support payments to plaintiff only if defendant itself sold the ACQ, not if a third party did the selling. Plaintiff read the same agreement as requiring defendant to make the payments, regardless who did the selling. In an opinion entered on March 16, 2004, I concluded that the agreement was ambiguous on this point and neither party had adduced any evidence to resolve the ambiguity. Thus, plaintiff had no right to damages under the language of the contract. In a second opinion, entered on May 18, 2004, I denied plaintiff's motion for reconsideration of this ruling, denied defendant's supplemental motion for summary judgment on plaintiff's claim of breach of good faith and fair dealing and granted defendant's motion as to plaintiff's claim for unjust enrichment.

The case proceeded to trial before the court on the good faith and fair dealing issue only and is now ready for decision. I find that defendant breached its duty of good faith when it granted Osmose a sublicense and failed to compensate plaintiff for the sales Osmose made in plaintiff's region. To remedy that breach, defendant will have to pay plaintiff $.50 a pound for sales that Osmose made in plaintiff's region on or before December 31, 2001. However, I am not persuaded that its duty to pay $.50 a pound extends beyond 2001. Just as defendant had a duty not to circumvent the purposes of the market supply agreement by entering into a sublicensing agreement that did not provide for payment to plaintiff, plaintiff had a duty to make a timely demand for market support payments tied to the sales by Osmose. It could have made that demand before the end of 2001 and thereby given defendant an opportunity to take advantage of the agreement's annual review provision. Having failed to do so, it is estopped from asserting a right to the full market support payments of $.50 a pound for the entire term of the agreement.

Although neither party produced any evidence about what a review would have produced, a reasonable starting point would be an amount less than the net royalty that defendant was receiving from Osmose or, in other words, the amount defendant received from Osmose less the royalty payments defendant had to make to Domtar. In my view, a reasonable figure would be half the net royalty. Defendant would not have been acting in good faith had it extinguished its entire obligation. Therefore, for the period from January 1, 2002 until the expiration of the market support agreement, I will assume that defendant would have paid plaintiff half its net royalty from Osmose for the sales Osmose was making within plaintiff's region.

For the purpose of this opinion, I incorporate the facts found in the two previous opinions and set out only those that are relevant to the issue of good faith and fair dealing.

## FINDINGS OF FACT

### A. *Background*

When defendant introduced ACQ as an alternative to CCA, both of the two other major CCA manufacturers, Osmose, Inc. and Arch, criticized the product openly. Wood treaters had no incentive to buy ACQ rather than CCA. CCA was industry-approved; all treaters used it; and it was less expensive than ACQ. People in the wood treating industry had an incentive to remain unified in their approach if only because they feared that any acknowledgment of problems with CCA would be

seized upon by environmental groups that wanted to ban all treated wood products.

In this atmosphere, plaintiff's president, Patrick Bischel, approached defendant in the early 1990's to purchase ACQ. Plaintiff saw ACQ as more profitable than CCA, which was subject to steep competition in the market and a growing public controversy over its hazardous contents. Plaintiff started treating wood with ACQ in 1994. Its initial investment was approximately $600,000. (Defendant rebated some of this cost later.) Plaintiff has always purchased and continues to purchase all of its ACQ products from defendant. Plaintiff worked out many of the production bugs and "charge" parameters for ACQ. (Charge refers to the length of time any given load of wood takes to "cook.") In 1994, plaintiff was the only wood treater using ACQ in Minnesota, Iowa, Wisconsin, South Dakota or the Upper Peninsula of Michigan and one of only six ACQ treaters in the country.

To overcome the resistance of the industry, defendant employed a regional marketing strategy, establishing relationships with selected wood treaters in different regions of the United States. Plaintiff was one of those regional treaters. Soon after it started using ACQ, it began making sales calls to retail lumber dealers to explain the differences between ACQ and CCA and let them know that it could provide ACQ-treated lumber. Plaintiff employed a sales force of four, in addition to its two officers, Pat and Jim Bischel, to promote the sales of ACQ. In 1994, plaintiff participated in a number of conventions, radio shows and trade shows, made formal presentations to 63 state, county and city specifiers, issued 105 news releases to newspapers, radio and television outlets and held an open house for regional lumber dealers to introduce ACQ-treated lumber.

In 1995, plaintiff was recognized by the Wisconsin Senate and the governor for its introduction of ACQ and by the Secretary of the Wisconsin Department of Natural Resources for the reduction of hazardous waste in the state. In the same year, plaintiff continued its marketing efforts by promoting ACQ at the Madison Area Builders Home and Garden Show and participating in a variety of other home shows throughout the Midwest. During the year, plaintiff secured commitments from 20 retail lumber dealers to market ACQ-treated products that year. In 1996, plaintiff sponsored a golf outing for existing and potential customers for ACQ products. The following year, it continued to promote ACQ products at trade shows, employee training programs and on radio shows. Plaintiff acquired two large new customers for ACQ-treated products in 1997. In the course of promoting ACQ, plaintiff provided tours of its facilities to potential clients, government officials and academics, assisted with lobbying efforts, conducted email campaigns, distributed auto decals and hosted golf outings.

Plaintiff contributed to a number of newspaper and magazine articles. Its role in a WCCO television news story resulted in additional news coverage around the United States on the risks of CCA-treated wood. In 2000, defendant's vice president of marketing and business development characterized plaintiff to his colleagues as "the horse that got us where we are."

During this time, defendant both aided plaintiff's marketing efforts and engaged in its own regional marketing. Defendant supplied plaintiff with brochures, banners, store signs and referrals to local architects who would be in position to purchase or recommend ACQ-treated lumber. It also made the initial contacts with many of the print and broadcast media sources and reimbursed plaintiff for some of its pro-

motion efforts. By mid–1997, defendant had retained an advertising and public relations firm to assist it in preparing a market strategy that would establish ACQ as the preferred wood treatment product. As part of this initiative, defendant targeted "big box" retailers such as Home Depot, Lowes, Menards, Hechinger/HQ and Home Base/Builder's Square. Its strategy was to use regulations and sales to the "mom & pop" lumberyards to convince the big retailers to convert to ACQ. Defendant used plaintiff's success as an ACQ treater as part of its marketing strategy.

In 1998, defendant engaged a law firm to do government relations work and to educate the public about ACQ. The firm coordinated efforts with plaintiff. Pat Bischel testified before the Listed Metals Advisory Board and organized people in plaintiff's region to write to the advisory council. Defendant used plaintiff and other ACQ treaters to take public stands on CCA because it did not want to endanger the CCA sales that were the core of its business.

Before plaintiff switched to ACQ exclusively in 1997, about one-third of its sales were from CCA-treated lumber. In making the conversion, plaintiff spent between $25,000 and $35,000 expanding its plant.

Plaintiff began negotiating a supply agreement with defendant in early 1998. Bischel told defendant's representatives that plaintiff did not want defendant to sell to any other wood treaters in Minnesota, Iowa, Wisconsin, South Dakota or the Upper Peninsula of Michigan. However, defendant refused to give plaintiff a long-term exclusive right to purchase ACQ in this region. Defendant had had a bad experience with an exclusive contract in the past when its exclusive customer failed to market actively. Plaintiff sought a price advantage over other regional treaters because Pat Bischel was concerned that plaintiff's profit margins would erode

as other treaters entered the market. After further negotiations, the parties reached an agreement in principle that defendant would make market support payments to compensate plaintiff for its past and future efforts in promoting ACQ in the region. Plaintiff and defendant made the specific terms of their agreement final in two contracts: a supply contract, which they executed initially in May 1998 and modified in November 1998, and a market support agreement, which they executed in November 1998. The parties never discussed the possibility that a third party might start selling ACQ.

Under the supply agreement, defendant was to supply plaintiff with ACQ for five years. For six months, plaintiff would have exclusive rights to purchase ACQ in a defined territory, which included Minnesota, Iowa, Wisconsin, South Dakota and the Upper Peninsula of Michigan, after which defendant could sell ACQ to other wood treaters in the region, but could not enter any long-term supply agreements with them so long as plaintiff continued purchasing ACQ at specified minimum levels. Under the marketing support agreement, defendant agreed to provide "marketing support at the rate of $0.50 per pound of ACQ Products sold to other ACQ treaters in your region." The term was to be the same five-year period specified in the long-term supply agreement. Defendant could review the marketing support program with plaintiff annually and adjust the marketing support program at that time.

Despite its earlier criticism of ACQ, Osmose, Inc., one of defendant's two major competitors, approached defendant in late 2000, seeking a license to manufacture and sell ACQ throughout North America. Defendant's president, Stephen Ainscough, believed that if defendant did not grant Osmose a sublicense for ACQ, Osmose would promote and market its own com-

petitive wood preservative or another preservative made by defendant's other major competitor, Arch. Although Ainscough did not think that either alternative product was as effective as ACQ, it feared that Osmose's marketing strengths would offset the relative weakness of the product and would be detrimental to sales of ACQ. In addition, he believed that co-opting one of the strongest opponents of ACQ would help his own marketing and increase sales for both companies. In March 2001, defendant sublicensed its ACQ technology to Osmose in an agreement under which Osmose is required to make royalty payments to defendant for each pound of ACQ Osmose sells. (Under defendant's license with Domtar, which holds the ACQ patent, defendant must make royalty payments on each payment from Osmose.)

On March 5, 2001, defendant sent a representative to meet with plaintiff to advise it of the agreement with Osmose before the agreement was made public. Plaintiff's representatives expressed displeasure with the agreement because it would create more competition in the ACQ market. They asked for a support package to insure that they would have an advantage over the wood treaters to whom Osmose might sell ACQ preservative. Defendant agreed to provide plaintiff with promotional support by having one of defendant's salespersons travel to plaintiff's region to promote ACQ-treated wood there. When the sublicensing agreement was announced publicly, defendant and Osmose released a joint press release to the effect that the agreement would expand the availability of ACQ-treated products in consumer and retail markets. When defendant's public relations firm prepared packages of press releases about the Osmose license, plaintiff mailed out a number of them at defendant's request.

In 2002, Menards, one of the largest national "big box" lumber retailers, began to market ACQ-treated lumber. Menards', wholly owned wood treater, Midwest Manufacturing, treats lumber at a plant approximately 15 miles from plaintiff's facility and had begun purchasing ACQ treatment products from Osmose in December 2001. Between December 2001 and November 18, 2003, when the market support agreement expired, Osmose sold 5,232,172 pounds of ACQ to Midwest Manufacturing. In December 2003, defendant made its first sale ever to Menards, selling it 10,500 pounds of ACQ preservative.

On January 30, 2003, plaintiff told defendant's representative that it expected market support payments from defendant for the ACQ preservative sold by Osmose in the region. Although the parties' representatives had met on five previous occasions since the creation of the sublicensing agreement, this was the first time that anyone had mentioned market support payments for Osmose's regional ACQ sales. Pat Bischel was afraid that if it brought the subject up, defendant would have turned down the request for payments. Defendant has refused plaintiff's request for market support payments for sales by Osmose. On July 8, 2003, defendant made a market support payment to plaintiff of $24,274.44 for sales of ACQ that defendant had made to Innovative Pine Technologies, Inc., a treater located in plaintiff's territory.

## OPINION

### A. *Breach of Duty of Good Faith*

█ Plaintiff's purpose in entering into the marketing support agreement was to preserve its competitive advantage in its region for as long as possible; defendant was willing to give plaintiff this advantage because plaintiff was crucial to defendant's efforts to gain industry acceptance of ACQ. Defendant understood that plaintiff's

promotional activities had redounded to defendant's benefit and would continue to do so. This is why defendant encouraged its public relations and lobbying firms to work with plaintiff and why it held plaintiff out as an example for the industry.

When defendant entered into the sublicensing agreement with Osmose, however, and took the position that enabling Osmose to make ACQ sales in plaintiff's territory was not the same thing as selling ACQ there, it frustrated the purpose of the marketing support agreement. Defendant was benefiting from plaintiff's efforts to win commercial approval for ACQ but excluding plaintiff from any similar benefit. Plaintiff would be subject to the increased competition in its own territory that it had feared but, according to defendant's construction of the contract, would not be entitled to any marketing support payments. Plaintiff was denied its reasonable expectations of realizing the fruits of its significant labors in promoting ACQ. Thus, defendant's sublicensing agreement with Osmose breached the undertaking implicit in defendant's marketing support agreement with plaintiff and in every other contractual agreement that one party will not take action that will prevent the other from reaping the benefits of the contract.

Defendant contends that the duty of good faith does not extend this far. It construes the duty of good faith as limited to intentional bad faith. On the eve of trial, it filed a motion to limit the scope of evidence at trial or for reconsideration of the denial of summary judgment on the good faith issue. In support of the motion, it cited the deposition testimony of Pat Bischel and James Bischel to the effect that they either did not believe that defendant had entered into the sublicensing agreement to avoid its obligations to plaintiff under the marketing support agreement or were not sure about defendant's motivation. Also, defendant referred to testimony by Osmose's corporate witness, who said that Osmose was never aware of the marketing support agreement and that Osmose never brought up the possibility that it would be selling ACQ to Menards' wholly owned wood treater in Wisconsin.

In bringing the motion for reconsideration, defendant relied on language in the May 18 order suggesting that defendant would be liable for depriving plaintiff of the benefits of the marketing supply agreement only if plaintiff could show that one of the reasons defendant entered into the sublicensing agreement with Osmose was to avoid its marketing support obligations to plaintiff. This suggestion was a misstatement of the law. Unfortunately, I reiterated this misstatement in the order entered on June 2, 2004, denying defendant's motion for reconsideration.

■ Wisconsin law does not limit breaches of the duty of good faith to intentional acts taken in bad faith. It construes the duty as applying to constructive bad faith and including such acts as failure to act, carelessness, neglect and actions that frustrate the purpose of the agreement. In *Foseid v. State Bank of Cross Plains*, 197 Wis.2d 772, 797, 541 N.W.2d 203, 213 (App.1995) (quoting the *Restatement (Second) of Contracts* § 205 cmt. d), the state court of appeals wrote that " '[s]ubterfuges and evasions violate the obligation of good faith in performance even the actor believes his conduct to be justified.... A complete catalogue of types of bad faith is impossible, but the following types are among those that have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.' " The court relied on *Estate of Chayka*, 47 Wis.2d 102, 176 N.W.2d 561 (1970), in

which a widow was held to have "breached the covenant of good faith that accompanies every contract, by accomplishing exactly what the agreement of the parties sought to prevent," *id.* at 107, 176 N.W.2d at 564, when she conveyed to her new husband most of the property left to her under her first husband's will. Before his death, the two had contracted to execute joint and reciprocal wills that would leave all property to the other and then to a relative after both of them had died. Although the wife left the relative all of the property that she had not conveyed to her new husband and thus could be said to have complied technically with her contractual agreement, the court found that her conveyance of the bulk of her property to her new husband was a repudiation of the purpose of the contract she had made with her first husband and thus a breach of "the requirement and standard of good faith in carrying out the contract of the parties." *Id.* at 109, 176 N.W.2d at 565.

Wisconsin's model jury instructions follow *Chayka* and *Foseid.* They provide that "[t]he requirement to act in good faith is a part of [every] contract just as though the contract stated it," Wis JI–Civil § 3044, and they instruct the jury that in deciding whether the duty of good faith has been met it should "determine the purpose of the agreement; that is, the benefits the parties expected at the time the agreement was made." *Id.* Further, the instructions provide that "[t]he duty of good faith means that each party to a contract will not do something which will have the effect of injuring or destroying the (rights) (ability) of the other party to receive the benefits of the contract." *Id.*

*Market Street Associates, Ltd. Partnership v. Frey,* 941 F.2d 588, 595 (7th Cir. 1991), is not to the contrary. In that case, the good faith issue turned on notice of a particular paragraph in the parties' contract that allowed the assignee of a lease on a shopping mall to buy certain property for less than its market value if the lessor refused to finance improvements to the property. The lessee asked for financing for improvements without mentioning the paragraph allowing the buy back and the lessor refused the request. More negotiations ensued; the lessee did not mention the paragraph. After three to four months of correspondence and efforts to reach the lessor by phone, the lessee wrote to say that it was exercising its option to buy the property at its initial cost plus interest. When the lessor refused to sell, the lessee commenced suit for specific performance. The district court ruled for the lessor, finding that the lessee had breached its duty of good faith when it failed to remind the lessor of the purchase option paragraph. On appeal, the court canvassed the Wisconsin law on good faith and concluded that the duty lies "halfway between a fiduciary duty (the duty of *utmost* good faith) and the duty merely to refrain from active fraud." *Id.* at 595. It added that "[t]he concept of the duty of good faith like the concept of fiduciary duty is a stab at approximating the terms the parties would have negotiated had they foreseen the circumstances that have given rise to their dispute." *Id.*

In *Market Street,* 941 F.2d at 597, the court of appeals sent the case back to the district court for a trial on the lessee's state of mind: did its agent believe that the lessor knew or would find out about the purchase option paragraph, in which case it could not be said to have acted opportunistically, or did he believe that the lessor had overlooked it or forgotten about it and did he deliberately take advantage of the oversight by not bringing it to the lessor's attention? Relying on this holding, defendant argues that it shows that state of mind is a necessary part of any good faith inquiry. In my view, *Market Street* holds only that in some instances,

state of mind may be relevant to deciding good faith; it does not hold that improper motive is a prerequisite of any showing of breach of the duty of good faith. If it did, it would be a misreading of the Wisconsin cases. In certain circumstances, such as the unusual ones in the *Market Street* case, motive is a prerequisite. Without improper motive, failing to tell another party to a contract of some provision of the contract would never be a breach of a duty. As the court of appeals observed, "[w]e do not usually excuse contracting parties from failing to read and understand the contents of their contract." *Id.* at 597. Only if the lessee took knowing and deliberate advantage of its contracting partner's mistake could its failure to mention the paragraph constitute a breach of good faith. *Id.*

### B. *Damages for Breach*

■ Defendant contends that even if it is found to have breached its duty of good faith, plaintiff is not entitled to any damages because it either waived its right to damages or is estopped from claiming damages. Plaintiff does not deny that it waited almost two years before advising defendant that it owed plaintiff marketing support payments for all the ACQ that Osmose had sold in plaintiff's territory. In the interim, plaintiff had met with defendant at least five times without ever mentioning this contention; indeed, when defendant first advised plaintiff of the sublicensing agreement, plaintiff's response was not to say that it believed it was entitled to $.50 a pound for Osmose's sales but to ask for a support package to give it an advantage over the wood treaters in its territory that might now buy ACQ from Osmose. The support package it agreed to was nothing more than a promotional visit to its territory by one of defendant's salespersons.

■ Waiver is "a voluntary relinquishment of a known right." *Milas v.*

*Labor Assn. of Wisconsin, Inc.,* 214 Wis.2d 1, 9, 571 N.W.2d 656 (1997). A party seeking to establish waiver must show that the person alleged to have made the waiver knew of the right he was relinquishing and acted voluntarily and intentionally in giving it up. *Id.* (" 'intent to relinquish [the right] is an essential element of waiver' ") (quoting *Von Uhl v. Trempealeau County Mut. Ins. Co.,* 33 Wis.2d 32, 37, 146 N.W.2d 516 (1966)); *see also* Wisconsin JI–Civil § 3057. Defendant has shown that plaintiff knew of its right; plaintiff's president, Pat Bischel, testified that when he learned about the license, the "thought came to his mind" that Osmose's sales would be covered by the marketing support agreement. The second question is more difficult. Did plaintiff intend to give up its right to collect marketing support payments? It waited almost two years from the time it learned about the sublicensing agreement to raise the matter of payments with defendant. If, as it suggests, it had no reason to raise the issue until Osmose made sales in its territory, nevertheless, it waited almost a year from the time it knew that Menards was selling ACQ-treated lumber to say anything to defendant about payments. Moreover, by asking for a special promotional package when it first learned of the sublicensing agreement, it implied to defendant that it did not view sales by Osmose as coming under the marketing support agreement.

■ The intent to waive can be inferred from the conduct of the party against whom the waiver is claimed, but "it is to be determined as a question of fact where the inference does not conclusively arise as a matter of law." *Davies v. J.D. Wilson Co.,* 1 Wis.2d 443, 467–68, 85 N.W.2d 459, 471 (1957). In *Davies,* the state supreme court overruled a judge's finding as a matter of law that an employee had waived his objections to his employer's underpayment

of sales commissions. The supreme court relied on evidence in the record from which the jury could have found that the employee had not agreed to the amount of the first sales commission; he had talked to his employer on other occasions about the amounts he had received; and he had continued to work for his employer in the hope that the employer would change his mind about the commissions owed to the employee. Although the employer denied that the employee had protested any but the first commission, the jury was entitled to believe the employee's testimony that he had brought the matter up on other occasions. Without this evidence, the judge could have found as a matter of law that the employee had waived his claim to greater sales commission by accepting the payments without objection and continuing to work. The ordinary rule is that an employee waives his right to contest his wage payments if he accepts them without objection, knowing that the employer considers them to be full payment, and continues in his employment. *Id.* at 467, 85 N.W.2d at 471.

Plaintiff's case is different in several respects. Defendant cannot point to any events that would have required plaintiff to take a position on marketing support payments related to the Osmose sales. It has nothing to show that plaintiff made an intentional relinquishment of its alleged right to payments. Defendant never made any marketing support payments to plaintiff until about six months after plaintiff had raised the issue of receiving payments for the Osmose sales, when it paid plaintiff for the ACQ sales to Innovative Pine Technologies, Inc. Defendant cannot contend that plaintiff's acceptance of that payment acted as a waiver of its right to additional payments. Not only was the dispute on the table by then but the payment was for an entirely different sale. Defendant never exercised its unilateral right to reassess the support payments so it cannot argue

that plaintiff waived anything by not bringing the subject up during an annual reassessment.

■■ Although it would be difficult to characterize plaintiff's actions or omissions as waiver, defendant argues alternatively that they amount to equitable estoppel. Estoppel requires action or non-action on the part of one against whom estoppel is asserted, inducing reasonable reliance by the other party, either in action or non-action, to that party's detriment. *Milas,* 214 Wis.2d at 10, 571 N.W.2d 656. In *Milas,* the state supreme court found that the elements of the defense of equitable estoppel had been met when the defendant county participated fully in an arbitration proceeding addressing its right to terminate the plaintiff's employment as a deputy sheriff before objecting to the arbitrator's jurisdiction. The court held that by participating, the county had implied that it was making a good faith effort to resolve the dispute through arbitration, that Milas had relied on the county's participation and failure to object to jurisdiction and had invested time and money in the arbitration proceeding when he might have sought relief in the state circuit court had he known of the county's objection to arbitration.

The holding in *Milas* fits the facts in plaintiff's case. Plaintiff's non-action (its failure to advise plaintiff of its position on the payments for Osmose's sales before November 18, 2001, when the contract would have allowed defendant to reassess the marketing support payment level for 2002 and later, for 2003) induced reliance by defendant in non-action (continuing the same marketing support payment levels it had set in November 1998, despite the dramatic change in market activity) to its detriment (having no opportunity to review and reduce the amount of the marketing support payments in light of the new cir-

cumstances). Plaintiff objects, contending that estoppel cannot be shown unless the person against whom it is asserted has a duty to speak. It did not have a duty to reassess the payment amounts; the right of reassessment belonged only to defendant.

Even when a party establishes the elements of equitable estoppel as a matter of law, the decision to actually apply the doctrine to provide relief is a matter of discretion for the trial court. *Nugent v. Slaght*, 2001 WI App 282, ¶ 30, 249 Wis.2d 220, 238, 638 N.W.2d 594, 602. " 'An appeal to equity requires a weighing of the factors of equities that affect the judgment—a function that requires the exercise of judicial discretion.' " *Id.* (quoting *Mulder v. Mittelstadt*, 120 Wis.2d 103, 115–16, 352 N.W.2d 223 (Ct.App.1984) (additional citation omitted)). Although the doctrine of equitable estoppel is traditionally applied to bar a claim or defense in its entirety, " '[a] trial court has the power to apply an equitable remedy as necessary to meet the needs of a particular case.' " *Id.*

This is a case in which discretionary application of the equitable remedy is warranted. Although defendant has suffered a detriment in the sense that it did not exercise its right to reduce the market support payment rates, the duty of good faith and fair dealing would have restricted it from doing so unreasonably, by for example, eliminating its obligation altogether by reducing the rate to nothing. Therefore, defendant's detriment, or its " 'injury or damage,' " *Milas*, 214 Wis.2d at 13, 571 N.W.2d 656 (quoting *City of Madison v. Lange*, 140 Wis.2d 1, 7, 408 N.W.2d 763 (Ct.App.1987)), was the difference between $.50 and a rate that was reasonable under the circumstances. Equity dictates that defendant should not be held liable for that portion of the market support obligation it would not be likely to have incurred had it known it had reason to exercise its right to adjust payment levels. In contrast, equity does not protect defendant from liability for payment amounts that it would not have avoided even had it known of plaintiff's claim and exercised its adjustment right accordingly.

Pat Bischel testified at trial that neither he nor anyone else at the company brought the payment issue to defendant's attention until January 2003 because it feared defendant would turn it down. This is no excuse for non-action. Plaintiff cannot remain silent and let defendant's liability mount simply because it fears defendant will reject its position on payments. Plaintiff had the same recourse in 2001 for defendant's intransigence that it had in 2003: to bring suit against defendant.

Had plaintiff given notice so that defendant could have exercised its right of review, it is reasonable to assume that defendant would have reduced the payment amount considerably, given the significant increase in quantity of sales by Osmose. It would not have agreed to pay plaintiff the full amount it was netting from the Osmose sales. On the other hand, defendant could not reduce the payments to zero without violating its duty of good faith to plaintiff. Given these limits, it is reasonable to assume that defendant would have agreed to pay plaintiff no more than half its net royalty for the 2002 term of the contract and no more than one-quarter of its net royalty for the 2003 year. In November 2001, the parties could have reasonably foreseen modest sales by Osmose in plaintiff's territory for the coming year; in November 2002, defendant could have foreseen that the sales would be considerably greater and would have wanted to reduce its payments to plaintiff accordingly. With increasingly greater sales by Osmose, plaintiff's reasonable contractual expectations would be met

by a correspondingly greater number of payments at a lower percentage per pound.

## ORDER

IT IS ORDERED that plaintiff Northern Crossarm Company is entitled to damages from defendant Chemical Supplies, Inc. in the amount of $.50 for each pound of ACQ wood preservative sold by Osmose, Inc. in plaintiff's territory before November 18, 2001; in the amount of one-half defendant's net royalty from Osmose, Inc. for each pound of ACQ sold by Osmose, Inc. in plaintiff's territory between November 18, 2001 and November 18, 2002; and in the amount of one-quarter defendant's net royalty from Osmose, Inc. for each pound of ACQ sold by Osmose, Inc. in plaintiff's territory between November 18, 2002 and the expiration of the parties' marketing support agreement. FURTHER, IT IS ORDERED that "net royalty" shall be the difference between the per pound royalty defendant receives from Osmose, Inc. for Osmose's sales of ACQ and the amount defendant pays Domtar, Inc. for each pound of ACQ it sells.