**MARKET STREET ASSOCIATES LIMITED PARTNERSHIP, a Wisconsin limited partnership, and William Orenstein, as general partner of Market Street Associates Limited Partnership, Plaintiffs,**

v.

**Dale FREY, Arthur Bahr, John H. Myers, Alan M. Lewis and Michael J. Cosgrove as Trustees for The General Electric Pension Trust; and The General Electric Pension Trust, Defendants.**

Civ. A. No. 89–C–0084.

United States District Court, E.D. Wisconsin.

April 6, 1993.

---

Jane C. Schlicht, William H. Alverson, Godfrey & Kahn, Milwaukee, WI, for plaintiffs.

James W. Greer, Jr., Whyte & Hirschboeck, Milwaukee, WI, and Sanford W. Morhouse, Dewey, Ballantine, Busby, Palmer & Wood, New York City, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

REYNOLDS, Senior District Judge.

### BACKGROUND

Plaintiffs are Market Street Associates Limited Partnership ("Market Street"), a limited partnership organized under Wisconsin law, and William Orenstein, ("Orenstein"), Market Street's general partner and manager. Orenstein has been in the real estate business since 1953, and has had personal involvement with numerous financing and improvement projects. Market Street owns and manages four retail store and warehouse properties. Defendants are The General Electric Pension Trust ("the Trust"), a New York common law trust created for the benefit of the employees of General Electric Company, its divisions and subsidiaries, and five of the Trust's trustees, who are sued in their representative capacities.

On January 15, 1968, the Trust and J.C. Penney Company entered into a sale and lease-back transaction through which J.C. Penney secured financing for corporate expansion purposes. Under the arrangement, J.C. Penney sold four properties to the Trust and then leased them back for initial terms of twenty-five years with options to extend each lease for up to six additional five-year periods. One of the leases covers a retail store and warehouse property located in West Allis, Wisconsin.[1]

On October 30, 1987, J.C. Penney assigned its leasehold interests in the four properties to Market Street. The Trust was advised of the assignment before it became effective. Market Street borrowed money to finance the acquisition of the properties from J.C. Penney.

The controversy involved in this action centers on the following lease provision for the West Allis property:

> From time to time during the basic term, Lessee may request Lessor to finance the costs and expenses of construction of additional Improvements upon the Premises. Such request shall set forth in reasonable detail the estimated amount of such costs and expenses, such amount to be not less than $250,000. Upon the receipt of each such request, *Lessor agrees to give reasonable consideration to providing the financing of such additional Improvements and Lessor and Lessee shall negotiate in good faith concerning the construction of such Improvements and the financing by Lessor of such costs and expenses.* . . . If Lessor and Lessee shall be unable to agree on the terms of financing of any such additional Improvements with estimated costs and expenses of $250,000 or more, Lessee may within 60 days thereafter give notice of its election to repurchase the Premises at a price equal to the unamortized cost of the Premises to Lessor as of the immediately preceding Basic Rent payment date and accrued interest on such amount at the rate of 6% per annum from such date to the date of purchase.

(The Lease ¶ 34 ("Financing Additional Improvements") (emphasis added) ("paragraph 34").) Market Street seeks specific performance directing the Trust to convey the West Allis property to Market Street for a purchase price of $216,336.13, plus interest and monetary damages in the amount of $658,590.

---

1. A copy of the lease is found at Ex. 11.

On October 3, 1990, this court granted summary judgment in favor of the Trust. That decision was reversed and remanded by the Seventh Circuit Court of Appeals. *See Market St. Assocs. Ltd. Partnership v. Frey*, 941 F.2d 588 (7th Cir.1991). The Seventh Circuit held that this court did not construe the facts as favorably as possible to Market Street, the nonmoving party, and that this court should discern Orenstein's state of mind through live testimony. These findings of fact and conclusions of law follow a court trial after remand.

## FINDINGS OF FACT

In the spring of 1988, Market Street began planning improvements for the properties it had obtained from J.C. Penney. With respect to the West Allis property, Market Street began negotiating with Phar–Mor, a chain of retail drug stores, to add over 50,000 square feet to accommodate a Phar–Mor store. Market Street then began to work on obtaining financing for the expansion. Market Street wanted to purchase the West Allis property because it determined that it would then be easier to finance and eventually sell the property.

Orenstein believed that it would be difficult to obtain financing from the Trust because it was a relatively small deal and he was unsure as to how the Trust would consider Phar–Mor credit. Orenstein was informed by the Trust that he should contact David Erb ("Erb") to request financing from the Trust. Erb was an investment manager in the real estate department at General Electric Investment Corporation, which is the investment advisor to the Trust's trustees. Orenstein had some difficulty contacting Erb; he phoned Erb five times (May 24, June 1, June 3, June 6, and June 7).

In a letter to Erb dated June 8, Orenstein stated that he wished to "open a discussion and perhaps a negotiation" regarding Market Street's possible purchase of the Market Street property. (Ex. 47 at 2.) In the letter, Orenstein asked Erb to review his file and call him for further discussion. While Erb has no specific recollection of receiving this letter and of his response, his normal practice was to give a copy of such correspon-

dence to an analyst who would review the file so there could be a response. These accounting files contain summaries of basic information regarding the lease, such as rent schedules and renewal options.

Orenstein received no written response to his phone calls or letter, and eventually contacted Erb approximately three weeks later; Erb said someone would get back to him. Erb then referred the matter to Gregory Fletcher ("Fletcher"), an investment analyst.

On June 29, Fletcher called Orenstein and told him that the Trust was willing to sell the West Allis property for $3 to $3.1 million. Orenstein felt that this price was inflated. Orenstein testified that he does not recall if he had calculated the property's purchase price pursuant to paragraph 34 at this time. Under that calculation, the price was significantly less than the property's present value or Fletcher's quote. After Fletcher's call, Orenstein felt that the Trust was non-responsive and had no interest in talking with Market Street.

On July 28, Orenstein sent a letter to Erb regarding financing from the Trust. Orenstein believed that the letter contained enough information so that the Trust could determine if it was interested in providing financing:

> Market Street Associates is in the process of negotiating a lease with Phar–Mor, Inc. for an addition to be built at the [West Allis property].... The cost of the addition is as follows:
>
> ... [deletion of specific breakdown of costs which total] $2,000,000.
>
> We propose to begin construction in September and are presently investigating financing opportunities.... We would like to discuss the financing with you and would appreciate it if you would call us as soon as possible.

(Ex. 49.) Erb has no specific recollection of receiving this letter. Orenstein made no follow-up calls to Erb or Fletcher regarding this financing inquiry. Orenstein anticipated that the Trust would respond and reference paragraph 34.

In 1988, the Trust received hundreds of financing inquiries. The standard practice in

the real estate department at General Electric Investment Corporation was to screen investment proposals as they came in according to investment criteria established by the trustees. At the time of Market Street's financing request, proposals involving less than $10 million were routinely rejected. Additionally, the Trust was not interested in construction loans. Proposals which did not meet these criteria were rejected with a form letter.

Erb may have recognized the property as owned by the Trust; however, because Orenstein's inquiry involved debt-financing, he was not interested regardless of whether the Trust had an interest in the property or not. Because Market Street's financing inquiry did not meet the Trust's basic investment criteria, it received the form rejection letter: "Thank you for the information you sent us on the above captioned [West Allis] property, however, we will not be in a position to express interest as this does not meet our current investment criteria. Once again, thanks for the opportunity to review the information." (Ex. 50.) The letter was dated August 10, and was received by Orenstein on August 17. Orenstein testified that after receiving this letter, he discussed with his son the possibility that the Trust may not know he was proceeding under paragraph 34.

On August 16, a day before receiving the Trust's form rejection letter, Orenstein sent a second letter to Erb regarding financing from the Trust:

By letter dated July 28, 1988, we advised you that Market Street Associates was negotiating a lease with Phar–Mor, Inc. for an addition to the captioned [West Allis] shopping center.... Although we requested that you call us as soon as possible, to date we have had no response. As in all real estate transactions, and especially in this one, timing is crucial.

The purpose of this letter is to ask again that you advise us immediately if you are willing to provide the financing pursuant to the lease. If you are willing, we propose to enter into negotiation to amend the ground lease appropriately. If you are unwilling to provide the financing, please

let us know that so that we can proceed accordingly.

(Ex. 51.) Orenstein testified that he did not refer to paragraph 34 in this letter because it was an office practice never to refer to specific lease provisions for fear of referring to the wrong provision or neglecting to reference all relevant provisions.

On August 22, Orenstein wrote to advise Erb that Market Street would pursue other sources for financing:

Although your letter in connection with the captioned matter was dated August 10, 1988, we didn't receive it until August 17th. That was a day after our August 16th letter addressed to you. Apparently the two letters crossed.

Anyway, we were sorry to hear that GE is not interested in the financing of our proposed addition in West Allis. We have opened negotiations with Great–West and First Interstate Bank who, as you know, were the principal lenders in our acquisition of the property from J.C. Penney.

(Ex. 52.)

Orenstein testified that he wrote this letter so there would be something in the file to indicate that he was seeking financing elsewhere because of the Trust's action. Orenstein was concerned that the Trust would offer financing at a later date. Orenstein believed that it would be difficult to negotiate financing under any circumstances, which is why he offered to purchase the property initially.

On September 27, Orenstein sent Erb a letter, written by counsel, to inform the Trust that Market Street was exercising its option to purchase the property pursuant to paragraph 34. (Ex. 53.)

Orenstein testified that he believed that the Trust had reviewed the lease in order to arrive at the offered selling price; it is "inconceivable" to Orenstein that the Trust would not have read the lease. Erb testified that he was not aware of paragraph 34, and the Trust did not review paragraph 34, until after receipt of the September 27 letter. It was therefore the first notice that the Trust had of Market Street's intention to enforce the purchase option of paragraph 34.

After evaluating the matter, the Trust agreed to meet with Market Street to negotiate the financing or sale of the property. On December 15, Erb travelled to Milwaukee and met with Orenstein. During this meeting, Erb said that he would not discuss the legal merits of the lease, but he expressed an interest in fulfilling the obligations under the lease and opening negotiations. Options that the Trust was willing to entertain were discussed, including the purchase of Market Street's interests for an amount not discussed and the purchase of the Trust's fee interest for $3.1 million. The Trust was also willing to negotiate financing, but Orenstein told Erb he would not discuss financing because Market Street had already made other commitments.

Shortly before the time set for closing, the Trust advised Market Street that it would not close because it considered paragraph 34's purchase option to be personal to J.C. Penney, and therefore not transferable to Market Street.

### CONCLUSIONS OF LAW

■ This court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds $50,000. As such, this court must apply the substantive law of Wisconsin to this action. *Erie v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■ Wisconsin courts imply a duty of good faith in every contract. *Crown Life Ins. Co. v. LaBonte*, 111 Wis.2d 26, 44, 330 N.W.2d 201 (1983) (citing *Estate of Chayka*, 47 Wis.2d 102, 107–108, 176 N.W.2d 561 (1970)). As stated by the Seventh Circuit, to deliberately "take advantage of your contracting partner's mistake during the performance stage ... is a breach of good faith." *Market Street*, 941 F.2d at 597.

■ "The dispositive question in the present case is simply whether Market Street Associates tried to trick the pension trust and succeeded in doing so. If it did, this would be the type of opportunistic behavior in an ongoing contractual relationship that would violate the duty of good faith performance...." *Id.* at 596.

Orenstein's initial correspondence to Erb regarding financing does not mention the lease or acknowledge a relationship between Market Street and the Trust. Orenstein did not contact Erb or Fletcher on the phone after he wrote this letter, as he did when inquiring about purchasing the property. In his second letter regarding financing, dated August 16, Orenstein does mention the lease, but does not discuss paragraph 34. Before receiving this letter, Erb sent out the rejection letter, obviously a form, which does not mention the lease. At this time, Orenstein knew that the Trust had not considered paragraph 34.

In his letter to Erb following receipt of the Trust's form rejection letter, Orenstein once again did not mention the lease; the letter apparently brings the issue of financing to a close by accepting the Trust's form rejection. Orenstein does not discuss or even mention paragraph 34 until the September 27 letter.

While Orenstein initially assumed that the Trust would review the lease and make its determination as to whether it should provide financing to Market Street in light of paragraph 34, he subsequently recognized that the Trust was not operating under paragraph 34. While Orenstein knew this fact, he did not bring the matter to the Trust's attention, and continued to write ambiguous letters, until he wished to utilize the purchase option, thereby purchasing the property at a discounted cost. By so doing, this court concludes that Orenstein breached his duty to use good faith in his dealings with the Trust, and Market Street is not entitled to specific performance.

**IT IS THEREFORE ORDERED** that the clerk enter judgment in favor of defendants Dale Frey, Arthur Bahr, John H. Myers, Alan M. Lewis, Michael J. Cosgrove and The General Electric Pension Trust and this action is DISMISSED on the merits.